## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DAVID W. NOBLE, JR.,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        Civil Action No. 94-302  (EGS)
                                        )
VINCENT R. SOMBROTTO, *et al.*          )
                                        )
and                                     )
                                        )
NATIONAL ASSOCIATION OF                 )
LETTER CARRIERS, AFL-CIO,               )
                                        )
                Defendants.             )
_____)

## <u>MEMORANDUM OPINION</u>

On September 30, 2005, the Court adopted defendants' post-trial amended findings of fact

and conclusions, and dismissed plaintiff's case with prejudice.  In that Order, the Court stated

that "although plaintiff was afforded an ample opportunity to file post-trial findings and

argument, his post-trial submission is limited to his 'April 26, 2004 Rebuttal Declaration of

David W. Noble, Jr.'."  Pending before the Court is plaintiff's Motion to Alter or Amend

Judgment.  Plaintiff argues that he properly and timely filed post-trial findings and arguments on

June 15, 2004 through the electronic case filing system ("ECF"), and forwarded courtesy copies

to the Court's chambers.  *See* Pl. Decl. Oct. 17, 2005.  In view of plaintiff's representations and

his supporting documents, which demonstrate that he did attempt to file his post-trial pleadings

in a timely manner, the Court accepts for review plaintiff's post-trial filings and arguments at this

time.  Upon careful consideration of both plaintiff's and defendants' post-trial filings and

arguments, the evidence presented at trial, and the entire record herein, the Court concludes for

the following reasons that plaintiff's Motion to Alter or Amend Judgment is **DENIED**.  The

Court affirms the judgment in favor of the defendants and against the plaintiff.

## I.   FINDINGS OF FACT

1.    Defendant National Association of Letter Carriers ("NALC") is a labor organization that

bargains on behalf of and represents all of the United States Postal Service's ("USPS")

city letter carriers.  All of the individually named defendants[1] were officers of the NALC

at all time relevant to this case.  Pl. Ex. 21 at 2-3.

2.    Plaintiff David W. Noble, Jr. has been a city letter  carrier for the USPS and a member of

NALC since 1975.  Pl. Decl., Apr. 2, 2004 ("Pl. Decl. 4/2/04") ¶ 4.  In 1979, defendant

Sombrotto appointed plaintiff to a position in NALC's Minneapolis, Minnesota regional

office. *Id*. at ¶ 14.  Then, in 1981, defendant Sombrotto appointed plaintiff to a position at

NALC headquarters in Washington, D.C. *Id*. ¶ 17.

3.    The NALC is governed by a Constitution.  Sombrotto, Trial Transcript, Apr. 13, 2004

("Tr. 4/13/04"), 52-53.  The NALC Constitution provides that the National Convention

shall be "the supreme body to which final appeal shall be made on all matters emanating

from Members, Branches and State Association." Pl. Ex. 52 at 4.  The Constitution also

provides that the National Convention shall be held biennially in even-numbered years.

---

[1] Vincent R. Sombrotto (President); Richart P. O'Connell (Secretary-Treasurer); Michael
J. O'Connor (Assistant Secretary-Treasurer); Lawrence G. Hutchins (Vice President); Walter E.
Couillard (Director of Retired Members); George N. Davis, Jr. (Director of Safety and Health);
William H. Young (Director of City Delivery); William M. Dunn, Jr. (Director of Life
Insurance); and Robert W. Vincenzi (Director of the NALC Health Benefit Plan). Pl. Ex. 21 at 2-
3.

*Id*. at 10.  At the biennial sessions, the NALC Convention may amend the Constitution. Sombrotto, Tr. 4/13/04 at 53.

4.  As set forth in Art. 9, § 11 of the NALC Constitution, the Executive Council is "[s]econd only to the Convention in legislative and policy-making authority." Constit. Art. 9, § 11(e), Defs. Ex. 1a at  42.  The Executive Council consists of twenty-eight  members: NALC's ten "Resident Officers," fifteen National Business Agents, and three Trustees. Pl. Ex. 52 at 42.

5.  The Executive Council is charged with the responsibility of acting between NALC conventions "on all matters related to the welfare of the Union not specifically prohibited by the membership." Constit. Art. 9, § 11(e).  It is also charged to "authorize and/or ratify the payment of salaries, wages, expense, allowances and other disbursement which it deems necessary and appropriate to the purpose and function of this Union, other than provided for. *Id*. at § 11(e)(3).  Further, the Executive Council is authorized to "give a general report from time to time through the President in *The Postal Record*[2], and biennially to the Convention." *Id*. at § 11(e)(15).  Finally, it is authorized to "establish such benefits as may be required to attract and retain competent personnel, including but not limited to annuity, welfare vacations, holidays, severance pay, tuition or scholarship, and insurance benefits." *Id*. at § 11(e)(4).

6.  The Constitution also provides that the President of NALC "shall submit at each Convention a  written report of all his/her official acts during his/her term of office." *Id*.

---

[2] *The Postal Record* is a monthly magazine published by NALC that is mailed to each NALC member. Tr. 4/13/04  at 55.

at § 9(1)(k).

**A.     The $500 Monthly In-Town Expense Allowance for Resident Officers.**

7.      In 1975[3], 1977[4], and 1980[5], the Executive Council passed Executive Council Resolutions

authorizing a $500 per month allowance  for Resident Officers.  *See* Defs. Ex. 8 at 25-26

(Executive Council Resolution, Jan.10, 1975); *Id*. at 27-28 (Executive Council

Resolution, Jan. 31, 1977);  Defs. Ex. 2 (Executive Council Resolution II, Dec. 8, 1980).

These resolutions were enacted pursuant to the Council's authority vested  in Article 9, §

11(e)(3) (1992 NALC Constit.)[6].  In the resolutions, the Executive Council stated  that

"resident officers...in the performance of their official duties are expected to regularly do

incur and pay transportation, entertainment, and other expenses for the benefit of the

Association in the Washington, D.C., Metropolitan Area, in amounts which are estimated

to approximate, on the average" the authorized amount. Defs. Ex. 8 at 27.  Further,  the

Executive Council stated that  it was "necessary and appropriate to provide an allowance

for such expenditures" *Id*.

8.      An officer was not required to submit any receipts to receive the $500 in-town expense

allowance. Defs. Ex. 2.  Officers, however, did not automatically get an allowance check

---

[3] Passed during the presidency of James H. Rademacher.

[4] Passed during the presidency of J. Joseph Vacca.

[5] Passed during the presidency of Vincent R. Sombrotto.

[6] When the resolution was authorized in 1975, the constitutional section  was numbered
as Art. 9, § 9(e)(3) (1974 NALC Constit.).  *See* Defs. Ex. 8 at 25.  In 1977, this section was
numbered as Art. 9, § 9(e)(3) (1976 NALC Constit.). *See Id*. at 27.  In 1980, this section was
numbered as Art. 9, § 11(e)(3) (1980 NALC Constit.). *See* Defs. Ex. 2.

each month. Sombrotto, Tr. 4/13/04 at 104.  Officers must request or apply for the allowance for a particular month. *Id.*; Defs. Ex. 2.

9.   To the extent an officer sought payment of expenses in excess of the authorized amount, the officer had to provide not only the receipt, but also the express authorization by the NALC President to incur the expense. Defs. Ex. 2.

10.  For taxation purposes, NALC reported any un-receipted "in-town" expenses paid to officers as income to the Internal Revenue Service ("IRS"). Sombrotto, Tr. 4/13/04 at 96, 127-128.

11.  The in-town expense allowance of defendant Vincenzi, former Director of the NALC Health Benefit Plan ("HBP"), was paid by the HBP pursuant to an HBP resolution dated April 2, 1981. Defs. Ex. 3. The expense allowance of defendant Dunn, former Director of Life Insurance, was paid by the United States Letter Carriers Mutual Benefit Association ("MBA") pursuant to an MBA resolution, dated January 13, 1983. Defs. Ex. 4.

12.  The resolutions authorized the reimbursement of *all* in-town expenses incurred by the President. *See* Defs. Ex. 8 at 26, 27; Defs Ex. 2.

**B.   The Payment of the Social Security Taxes of Officers.**

13.  On December 8, 1980, the Executive Council approved Resolution XXI, entitled "Fringe Benefit," which provided for payment of the employee portion of FICA taxes for all full-time elected and appointed NALC officers. *See* Defs. Ex. 5 (Dec. 8, 1980 Resolution XXI).

14.  In 1980, all letter carriers, plus other federal postal workers, participated in the Civil Service Retirement System ("CSRS"). Full-time union officers also participated in the

CSRS and paid their  share of the CSRS payments.

15.     Upon becoming a full time union officer, however,  the officer was also required to

participate in the Social Security System, and pay mandatory FICA taxes.  The 1980

Resolution  provided that NALC would pay the employee portion of the FICA taxes for

all full-time appointed and elected officers, while the officers continue to pay his/her

portion of the CSRS. Pl. Ex. 21 at 6-7.

**C.      Per Diem Payments to Officers.**

16.     Article 13, § 2 of the NALC Constitution proves that the Union shall pay per diem to

each officer "as the National Association, while in session, may direct."  Art. 13, § 2.

Article 11, § 6 provides for a Committee on Mileage and Per Diem that "shall compute

and report to the National Convention the name, residence, and amount due each member

eligible for mileage and per diem."  Art. 11, § 6.

17.     Prior to the 1964 Convention, the Committee on Mileage and Per Diem reported the

entitlement for per diem to the Convention by name and amount. Def. Ex. 8 at R5-R6.  At

the 1964 Convention, however, a majority of the Delegates decided to dispense with the

reading of the individual payments. *Id.* at R6.  Rather than read the names of the delegates

and the amount of per diem to be paid, the Mileage and Per Diem Committee provided a

report of the estimates of the lost time per day, hotel rates, meals, and incidentals for a

total per diem allowance per eligible delegate (including officers) for each day of the

Convention, instead of accumulating and reviewing itemized receipts. *See* Pl. Ex. 21 at 8.

18.     Any per diem paid to the individual defendants, like the identical per diem paid to the

delegates, was approved by the Convention. *See* Young , Trial Transcript, Apr. 14, 2004,

("Tr. 4/14/04") at 18.

19.     The per diem is not reduced because of a person's pay status (*i.e.*, whether he or she "lost

time"), or actually incurred expenses (*i.e.*, whether he or she paid for or was provided a

complimentary hotel room). Def. Ex. 8 at R6; Young , Tr. 4/14/04 at 18.  If any

Convention delegate wanted to protest the amount of the per diem or the method by

which it was calculated by the Mileage and Per Diem Committee, the delegate could

object, argue for the rejection of the Committee's report, and offer an alternative

proposal. Pl. Ex. 21 at 8.

  **D.     The 1986 National Convention Increases the Salary of the President**.

20.     At the 1986 Biennial Convention, the delegates debated a proposal to amend the NALC

Constitution by increasing the salary of the President from $65,038 to $93,650 per year.

Defs. Ex. 11 at 75, 80.  During the debate, Delegate Karen Lippe offered an amendment

to the proposal from the floor that would have lowered the salary increase to $70,038.

Defs. Ex. 11 at 75. *See also* Young,  Tr. 4/14/03 at 6.  This lower increase was warranted,

according to Lippe, because "[b]ased on the figure of $65,038, which is currently in the

Constitution, there are some unseen salary increases that the membership needs to be

aware of." Defs. Ex. 11 at 75.  According to Lippe, some of the "unseen salary increases"

were that "NALC pays both sides of the Social Security taxes" of NALC officers and that

"all resident national officers receive a sum of $6,000 per annum in unaccountable

expense money." *Id.*

21.     During the debate, Delegate Davis opposed Delegate Lippe's proffered amendment,

stating that officer "fringe benefits" and salary increases were separate issues. *Id*.  The

7

Convention rejected Lippe's proposed amendment. The Convention adopted the increase to $93,650, after debating  the effect of the payment of Social Security taxes and the monthly expense allowance.  *Id.* at 80.  The delegates to the 1986 Convention then passed a motion to approve the salary increases of the other NALC officers. *Id.*  Copies of the minutes from NALC Conventions, including the 1986 Convention, were distributed to NALC's 2,700 branches and made available to members for their review. Pl. Ex. 21 at 9.

E.      **Plaintiff's Internal Union Charges Against the Executive Council.**

22.    In August 1993, plaintiff filed internal union charges against all members of the NALC Executive Council.  The charges alleged that the in-town expense allowance, the Social Security reimbursements, the per diem payments, and the Washington, D.C. housing costs for defendants Sombrotto and O'Connell were improperly paid by the Union and violated the NALC Constitution.  Plaintiff requests that each member of the Executive Council repay NALC the full amount of the allegedly unauthorized payments plus interest, and that each Executive Council member be removed from office and expelled from NALC.

23.    Article 10 of NALC Constitution sets forth a procedure when one or more officers are charged with neglect of duty or violation of the Constitution, wherein the Executive Council resolves the charges. Defs. Ex. 1a at 45-47.  Nothing in NALC's Constitution provides a procedure for hearing charges against the entire Executive Council.

24.    On August 26, 1993, the members of Executive Council met by teleconference and unanimously voted to recuse themselves from determining the merits of the charges brought by plaintiff.  Defs. Ex. 8 at 1.  President Sombrotto, pursuant to Art. 9, § 11(e),

issued a Presidential Ruling on August 27, 1993, which established a five member Investigating Committee to investigate the charges and report in writing to a Special Meeting of the NALC Convention on October 13, 1993. Defs. Ex. 7 (Presidential Ruling, Aug. 27, 1993).  The Committee was authorized to meet with and question any NALC member; to examine all NALC books and records; to consult with NALC staff, counsel and independent auditors; and to take such further action as it deemed appropriate to its investigation. *Id.*

25.    The five NALC members selected for the Investigating Committee were: William Burroughs from Branch 1071 in Miami, Florida; John DiTollo from Branch 84 in Pittsburgh, Pennyslvania; Ken Christy from Branch 219 in Aurora, Illinois; John Gaunce from Branch 2092 in Tri-Valley, California; and Prissy Grace from Branch 283 in Houston, Texas. DiTollo, Tr. 4/14/04 at  87-88; Defs. Ex. 8 at 2.

26.    Plaintiff by letter dated August 16, 2006, requested to inspect, review and verify books, records and documents.  Pl. Ex. 31 at 3.  Although NALC informed plaintiff that he had failed to establish "just cause" under 29 U.S.C. § 432(c) to inspect the Union's documents, NALC, nonetheless, made available to plaintiff copies of NALC records relevant to his charges. Defs. Ex. 7.

27.    Plaintiff inspected documents on October 7, 1993.  Pl. Decl. 4/2/04 at 25.

28.    By letters dated September 13 and 20, 1993, the Investigating Committee rejected plaintiff's requests that he be permitted to attend the investigatory meetings, call and examine witnesses, and be provided with a copy of the Investigating Committee Report 15 days before the Special Meeting. The Committee stated that it was an investigative

body not a hearing body and in its view, it was not bound by the procedures of Art. 10 of the NALC Constitution. Pl. Exs. 35, 36.

29.     The Investigating Committee retained an independent auditor, Grant Thornton, for assistance in preparing its report to the Special Convention. DiTollo, Tr. 4/14/04 at 107. *See also* Defs. Ex. 8 at A-1 – A-22.   Grant Thornton examined the records of NALC, the NALC Health Benefit Plan ("HBP") and the United States Letter Carriers Mutual Benefit Association ("MBA"). Defs. Ex. 8 at A-1.

30.     Grant Thornton made the following conclusions:

    a.      that the $500 per month for in-town expenses of Resident Officers had been made pursuant to resolutions of the Executive Council (or, where appropriate, by HBP or MBA resolution) and had not been exceeded in any month, *see* Defs. Ex. 8 at A-1;

    b.      that the reimbursement of Social Security taxes of NALC officers had been made by NALC, as shown in payroll records, *id.*;

    c.      that NALC officers received per diem payments for National Conventions in the amounts approved by the Convention delegates *id.*; and

    d.      that all rental payments by NALC for the Washington, D.C. apartments of defendants Sombrotto and O'Connell were fully reimbursed to NALC through payroll deductions, *id.*

31.     The Investigating Committee drafted an eight page report, signed by all members of the Committee, and assembled a seventy-seven page booklet of exhibits plus the Grant Thornton Report that were distributed to the delegates to the NALC Special Meeting.

Defs. Ex. 8.  The Report was prepared solely by the Investigating Committee and was not disseminated prior to the Special Meeting. DiTollo, Tr. 4/14/06 at 90.

32.   The Special Meeting on October 13, 1993 was attended by 2,484 registered delegates. Defs. Ex. 10 at 125 (Transcript of 1993 Special Meeting).  Each delegate to the Special Meeting received a copy of the Report and Exhibits.  Members of the Investigating Committee made a verbal presentation to the delegates of the Special Meeting setting forth the charges and key factual findings of the Report. *Id.* at 42, 53-70.  The charging party and the charged parties (as a group) were each allotted thirty minutes to address the meeting.

33.   The Special Meeting found, by  vote of  1,956 to 72, that it was valid for Resident Officers to receive in-town expenses. Defs. Ex. 10 at 118.  By a vote of 2,229 to 38, the Special Meeting upheld the validity of NALC's payment of officers' Social Security taxes. Defs. Ex. 10 at 120.   By a vote of 1,983 to 72, the Special Meeting found the payment of the per diem was proper. Defs. Ex. 10 at 121.

   **F.     The 1994 National Convention.**

34.   NALC held its 59th Biennial Convention on August 22-26, 1994. Defs. Ex. 12.

35.   During this convention, certain delegates proposed several amendments to the NALC Constitution that addressed plaintiff's allegation that per diem payments to the individual defendants constituted unauthorized compensation. Defs. Ex. 12 at 32-33. *See also* Young, Tr. 4/13/06 at 181.  All the proposed amendments were debated and defeated. Defs. Ex. 12 at 33.

36.   Certain delegates also proposed amendments to restrict the constitutional authority of the

11

Executive Council. Defs. Ex. 12 at 42-43. Delegates proposed an amendment to Art. 9, §
11(e)(3) that would limit the power of the Executive Council to authorize salaries, wages,
expenses, allowances, and other disbursements by inserting a provision that "no monetary
benefits for elected officers may exceed those provided for in the constitution." Defs. Ex.
12 at 42-43.  Under another proposed amendment, the Executive Council would only
have the power to authorize the salaries, wages, expenses, allowances and other
disbursements "other than their own." Defs. Ex. 12 at 42-43.  Both proposed amendments
were defeated. Defs. Ex. 12 at 42-43.

37.    The Convention also considered a proposed amendment intended to govern any future
instance in which internal union charges were brought simultaneously against all the
members of the Executive Council. Defs. Ex. 12 at 42-43.  All of the proposed
amendments were defeated. Defs. Ex. 12 at 42-43.

    **G.    The 1996 National Convention**.

38.    NALC held its 60th Biennial Convention on August 12 - 16, 1996. Defs. Ex. 13.

39.    As in 1994, a delegate proposed an amendment to limit the Executive Council to
authorizing only salaries, wages, expenses, allowances and other disbursements "other
than their own." Defs. Ex. 13 at 40-41.  Another delegate proposed an amendment that
would have required the Committee on Mileage and Per Diem to consider national
Resident Officer expenses separately from those of other members eligible for payment.
Defs. Ex. 13 at 41.  Both proposed amendments were rejected by the Convention. Defs.
Ex. 13 at 41. *See also* Young, Tr. 4/13/04  at 181.

40.    The 1996 Convention did pass a resolution that approved and confirmed the

constitutionality of NALC's practice of paying the $500.00 expense allowances to Resident Officers, paying the employee share of the Social Security taxes for full time national officers, and paying Convention per diem to NALC officers in the amount set by the Committee on Mileage and Per Diem. Defs. Ex. 13 at 41-42.

41.     A special Resolution was approved by the Convention by a vote of nearly 88% of the approximately 4,500 delegates voting. Defs. Ex. at 40.  The Resolution provides:  [T]he following NALC past practice payments are hereby approved and confirmed:

 a.  Up to $500 per month allowance to Resident Officers for in-town expenses;

 b.  Employee share of Social Security and Medicare taxes for full-time national officers;

 c.  Per diem payments while the Convention is in session in the amount set by the Committee on Mileage and Per Diem to the NALC Officers;

 d.  These payments have been and continue to be proper under the NALC Constitution and Executive Council resolutions.  These payments shall continue in the future unless superseded by a subsequent Convention or Executive Council action.  *Id.*

**H.  Payment of the In-Town Expense Allowance and Social Security Taxes for Defendants Dunn and Vincenzi.**

42.     The in-town expense allowances and the employee share of the Social Security payments for individual defendants Dunn and Vincenzi were paid by entities separate and distinct from NALC, the Health Benefit Plan in the case of Vincenzi, and the Mutual Benefit Association in the case of Dunn. *See* Young, Tr.  4/14/04 at 72-76.  Their expense

allowances and employee Social Security taxes were not paid with NALC funds. *Id.*

## II.    CONCLUSION OF LAW

1.   Plaintiff  has commenced this action pursuant to Section 501 of the Labor-Management

Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501; Section 201(c) of the

LMRDA, 29 U.S.C. § 431(c); and Title I of the LMRDA.

2.   Defendant NALC has a right to take a position and participate fully in this lawsuit because

the union's institutional interests are at issue. *See Weaver v. United Mine Workers of Am.*,

492 F.2d 580, 586 (D.C. Cir. 1973).

### A.    The NALC and the Individual Defendants Did Not Violate Section 501(a) of the LMRDA.

#### i.    Legal Framework

3.   Section 501 of the LMRDA imposes a "fiduciary responsibility" upon union officers to

hold the union's money and property "solely for the benefit of the organization and its

members and to manage, invest, and expend the same in accordance with its constitutions

and bylaws and any resolutions of the governing bodies adopted thereunder…." 29 U.S.C.

§ 501(a).

4.   There is a "general Congressional policy to allow unions great latitude in resolving their

own internal controversies." *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964). Federal courts

have applied a long-standing policy of avoiding judicial interference in a union's self-

governance and internal affairs. *Fish v. Hubbell*, 51 F.2d 319, 320 (D.C. Cir. 1931).

Consistent with this policy, the LMRDA "does not give courts a license to interfere

broadly in internal union affairs." *Morrissey v. Curran*, 650 F.2d 1267, 1273 (2d Cir.

1981). *See also Gabauer v. Woodcock*, 594 F.2d 662 (8th Cir. 1979); *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971).

5.    The Section 501(a) analysis begins with the plaintiff's burden to prove that the challenged action is not properly authorized under the union's constitution. *United Mine Workers of Am. v. Boyle*, 1975 U.S. Dist. LEXIS 14916, at *6-*7 (D.D.C. Dec. 9, 1975). Thus, "an interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court, and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith." *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984). "Accordingly, courts are loath to substitute their judgment for that of union officials and will afford due deference to those interpretations which are reasonable and made in good faith." *Caivano v. Laborers Int'l Union of N. Am.*, 149 L.R.R.M. (BNA) 2296, 2297 (D.D.C. May 3, 195). Courts refrain from imposing their interpretation of the constitution, even when a court interprets the constitution differently than the union's officers. *Felton v. Ullman*, 629 F. Supp. 251, 254 (S.D.N.Y. 1986).

6.    When analyzing the reasonableness of the union officials' interpretation, courts look to "whether there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight." *Stelling v. Int'l Bhd. of Elec. Workers*, 587 F.2d 1379, 1389 & n.10 (9th Cir. 1978).   Therefore, when union officers authorize the disbursement of funds or make the payment of funds in accordance with the union's constitution—or pursuant to an interpretation of the constitution that is not unreasonable or in bad faith—then the Court should find that the  officers did *not* violate

Section 501(a), without any further inquiry. *Ray v. Young*, 753 F.2d 386, 390 (5th Cir. 1985).

7.   Consistent union past practices may be relied upon to establish the validity of an interpretation of a union constitution. *See Conley v. Parton*, 116 L.R.R.M. (BNA) 3071, 3075-76 (N.D. Ind. 1984); *Robinson v. Weir*, 65 L.R.R.M. (BNA) 2956, 2957 (D. Neb. 1967).

### ii.   The In-Town Expense Resolution was Properly Authorized.

8.   The Executive Council has interpreted Art. 9, § 11(e) and subsection (e)(3) to allow it to adopt an allowance to pay for in-town expenses.  Article 9, Section 11(e) provides that, "[s]econd only to the Convention in legislative and policy-making authority, [the Executive Council] shall act between Conventions on all matters related to the welfare of the Union not specifically prohibited by the membership….".

9.   Article 9, § 11(e)(3) further provides that the Council "authorize and/or ratify the payment of salaries, wages, expenses, allowances, and  other disbursements which it deems necessary and appropriate to the purpose and functioning of this Union, other than provided for."  As interpreted by the Executive Council, these two sections of the Constitution conferred authority upon the Council to authorize the payment of allowances and/or expenses not otherwise provided for.

10.   No where in the NALC Constitution does it either specifically prohibit or otherwise provide for the payment of either an in-town expense allowance or the reimbursement of un-itemized expenses. Accordingly, the Executive Council reasonably interpreted the NALC Constitution to permit a $500 per month in-town expense allowance resolution for

Resident Officers.  Further,  the Council's determinations for many years that it would not require Resident Officers to submit receipts for in-town expenses were reasonable and made in good faith. *Morrissey*, 650 F.2d at 1283.

11.    No evidence has been presented that the in-town expense allowance was utilized by Resident Officers for purely personal reasons, unrelated to union business. *Stodghill v. Service Employees Local Union No. 50*, 13 F. Supp.2d 960, 968 (E.D. Mo. 1998), *aff'd in relevant part, rev'd on other grounds*, 192 F.3d 1159, 1164 (8th Cir. 1999).  Rather, there is sufficient evidence  to establish that the payment of the in-town expense allowance provided a benefit to the union, *viz.*, facilitating the Resident Officers' ability to conduct internal and external union business in the Washington, D.C. region. *Morrissey*, 650 F.2d at 1283 (finding absence of evidence of impropriety and, given evidence of business-related use, finding allowances were proper and reasonable).

###    iii.    The Social Security Tax Was Properly Authorized.

12.    Just as Art. 9, §§ 11(e) and subsection (e)(3) properly conferred authority on the Council to provide in-town expense allowance for Resident Officers, the same provisions of the NALC Constitution  properly authorized the union's payment of the employee portion of Social Security taxes for full-time appointed and elected officers.  Plus, Art. 9, § 11(e)(4) provides the Council with the authority to "establish such benefits as may be required to attract and retain competent personnel, including but not limited to annuity, welfare, vacations, holidays, severance pay, tuition or scholarship and insurance benefits."

13.    In 1980, the Executive Council passed a resolution providing that NALC would pay the employee portion of the taxes mandated by FICA  for all  full-time appointed and elected

17

officers.  The  Council passed ths resolution to alleviate the "double taxation" imposed

upon officers for federal retirement purposes. As letter carriers, the USPS withheld a

certain amount of pay from the employees' paychecks for mandatory contributions to the

CSRS.   When letter carriers assumed union office, they were also required to pay the

employee portion of FICA taxes.  Thus, unless the officers chose  the economically

disadvantageous option of withdrawing from the CSRS, the officers were subject to

double taxation for two federal retirement systems.

14.    By paying  the employee portion of the FICA taxes, the Executive Council lessened the

financial burden on individuals who chose to hold appointed or elected position within

NALC to serve the union and its membership.  In sum, the Executive Council reasonably

interpreted Art. 9, § 11(e) and subsections (3) and (4) to provide the Council with

authority to enact the Social Security fringe benefit.

       **iv.    The Payment of Per Diem by the NALC Convention was Proper.**

15.    Art. 13, § 2 of the NALC Constitution provides that, "[p]er diem shall be paid to each

officer as the National Association, while in session, may direct."  Further, the

Constitution provides that, "[t]he Committee on Mileage and Per Diem shall compute and

report to the National Convention the name, residence, and amount due each member

eligible for mileage and per diem."   The  Constitution does not contain any definition of

"per diem," any calculation of per diem, or any rules for paying per diem.

16.     At the outset of the Convention, a NALC trustee reports a recommended dollar amount

for the daily per diem and a breakdown of the components of the per diem (including, for

example, food, lodging and lost time). At  the conclusion of the Convention, the

18

Committee on Mileage and Per Diem reports the total sum of per diem to be paid and the total number of persons to receive per diem. This report can be adopted or rejected by the Convention.  This is clearly a reasonable system of per diem payments to national officers and others.

17.     Further, in 1964,  the record shows that a majority of the delegates at the Convention decided to dispense with the reading of the individual payments. Rather than read the names of the delegates and the amount of per diem to be paid, the Mileage and Per Diem Committee provided a report of the estimates of the lost time per day, hotel rates, meals and incidentals for a total per diem allowance per eligible delegate (including Officers) for each day of the Convention instead of accumulating and reviewing itemized receipts. This practice has been continued ever since and there is no evidence that any delegates, including Mr. Noble,  have ever moved to resume the practice of announcing names, residences, and amounts.   Therefore, the payment of per diem is consistent with the text of the NALC Constitution and the Union's practice.

     **v.     The NALC Constitution Does Not Require Disclosure**.

18.     The NALC Constitution does not require Council resolutions to be disclosed to, or approved by, National Conventions or the membership at large, and NALC has never interpreted the Constitution to require such disclosure. Accordingly, the fact that the 1980 Executive Council resolutions on in-town expense allowances  and Social Security taxes were not formally disclosed does not show that the resolutions were not reasonably authorized in good faith under the NALC Constitution.

19.     Further, although Art. 9, § 1(k) requires that the President "shall submit at each

Convention a written report of all his/her official acts during his/her term of office," the Executive Council resolutions at issue in this case were official acts of the Executive Council, not the President.  Therefore, NALC's interpretation of its Constitution that it does not require such reporting of resolutions is reasonable.

**vi.    The 1993 Special Meeting Was Not an Invalid Exculpatory Action.**

20.    An action is exculpatory and thus invalid only where it purports *retroactively* to excuse or validate a prior Section 501 violation, not when it merely confirms that no Section 501 violation ever occurred. *Cf. McNamara v. Johnston*, 522 F.2d 1157, 1164 (7th Cir. 1975); *Morrissey v. Curran*, 423 F.2d 393, 399 (2d Cir. 1970).

21.    The 1993 Special Meeting confirmed the propriety and validity of the challenged authorizations and payments. It did not purport to retroactively excuse a prior violation of Section 501(a).   The Special Meeting confirmed that the payments were fully authorized under NALC's Constitution. The determinations of the 1993 Special Meeting were also reaffirmed at the National Conventions in 1994 and 1996. A resolution of the majority of voting members at a National Convention upholding, after informed disclosure, an Executive Board's interpretation of a union's constitution "undermines a finding that the Board's interpretation was unreasonable and made in bad faith." *Monzillo*, 735 F.2d at 1464.

**vii.    Claim under § 201(c) of the LMRDA is Moot.**

22.    During the course of this case, plaintiff has been given access to all of the pertinent NALC records.  Further, he no longer contends that he is being denied access to any documents necessary to verify an annual financial report. Therefore, this claim is moot

and is dismissed.

**viii.    Title I of the LMRDA Has Not Been Violated.**

23.    Plaintiff Noble has contended that his rights under Title I of the LMRDA, 29 U.S.C. §

411(a)(1), (2) & (5), were violated during the proceedings leading up to the 1993 Special

Meeting.

24.    Section 411(a)(1), 29 U.S.C. § 411(a)(1), provides that every member shall have equal

rights and privileges to nominate candidates, vote in elections, attend membership

meetings, participate in deliberations and vote on union business. Noble has made no

allegation that he was denied any of these rights as a member.

25.    Section 411(a)(2) provides that members shall have the right to meet and assemble freely

with others. 29 U.S.C. § 411(a)(2). Noble has not been denied the right to meet with or

communicate with other members. *Helton v. NLRB*, 656 F.2d 883 (D.C. Cir. 1983). In

addition, any claim by Noble that parliamentary procedure was violated during the

investigation and presentation of his charges is not cognizable under this Section. *Bartosh*

*v. Letter Carriers*, No. 85-104 COL, 122 L.R.R.M. (BNA) 2547, 2548 (M.D. Ga. 1985).

26.    Section 411(a)(5) provides that no member may be disciplined, suspended or expelled

unless the member is served with written charges, given a reasonable time to prepare a

defense and afforded a full and fair hearing. 29 U.S.C. § 411(a)(5). This section affords

enumerated rights to the accused, therefore, it is not applicable to the plaintiff.

Accordingly,  plaintiff's claim under Title I of the LMRDA is dismissed.

### III.    CONCLUSION

For the foregoing reasons, because plaintiff has not proved any violations of Section 501

of the LMRDA, 29 U.S.C. § 501(a), Section 201(c) of the LMRDA, 29 U.S.C. § 201(c), or

Sections 101(a)(1), (2) and/or (5) of Title I of the LMRDA, 29 U.S.C. §§ 411(a)(1), (2) & (5), all

of his claims are DISMISSED WITH PREJUDICE.  Accordingly, plaintiff's Motion to Alter or

Amend Judgment is DENIED.   An appropriate order accompanies this memorandum opinion.


**SIGNED:      EMMET G. SULLIVAN**
**              UNITED STATES DISTRICT JUDGE**
**              SEPTEMBER 20, 2006**