UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DAVID W. NOBLE, JR.,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              ) Civil Action No. 94-302 (EGS)
                                        )
VINCENT R. SOMBROTTO, et al.,           )
                                        )
                Defendants.             )
_____)

## SUPPLEMENTAL FINDINGS AND CONCLUSIONS

David Noble, a member of the National Association of Letter Carriers ("NALC"), brought this lawsuit in 1994 against Vincent Sombrotto, the NALC's then-president, as well as nine other officers of the NALC, an officer of the union's Mutual Benefit Association, and an officer of the union's Health Benefit Plan.[1] Mr. Noble accused the individual defendants of violating their fiduciary duties to the NALC under Section 501 of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq.*, by accepting: (1) an in-town allowance of $500 per month to cover costs incurred in the performance of their

_____
[1] Over the course of this litigation, five of the individual defendants—Vincent Sombrotto, Francis Conners, Walter Couillard, George Davis, and Richard O'Connell—have died. As to each individual, the defendants filed a suggestion of death pursuant to Federal Rule of Civil Procedure 25(a)(1) and no motion to substitute was filed. The Court accordingly dismissed those individuals from this case. *See* Order, ECF No. 173; Minute Order of August 30, 2013; Minute Order of December 2, 2013.

duties; (2) reimbursement for the employee portion of their Federal Insurance Contributions Act taxes; and (3) per-diem payments during the union's national conventions. Mr. Noble also alleged that the defendants violated their obligations under Section 201 of the LMRDA by refusing his requests to inspect certain documents in order to verify the contents of financial reports that the NALC filed with the Department of Labor.

On April 28, 2003, this Court denied the parties' cross motions for summary judgment. *See Noble v. Sombrotto* ("*Noble I*"), 260 F. Supp. 2d 132 (D.D.C. 2003). The Court subsequently held a trial and received proposed findings of fact and conclusions of law. On September 30, 2005, the Court adopted the defendants' proposed findings, and dismissed Mr. Noble's claims. *See* Order, ECF No. 239. The Court denied Mr. Noble's motion to reconsider on September 20, 2006. *See Noble v. Sombrotto* ("*Noble II*"), No. 94-302, 2006 WL 2708796 (D.D.C. Sept. 20, 2006).

Mr. Noble appealed to the D.C. Circuit, which affirmed in part and reversed in part. *See Noble v. Sombrotto* ("*Noble III*"), 525 F.3d 1230 (D.C. Cir. 2008). The D.C. Circuit affirmed this Court's dismissal of Mr. Noble's Section 501 claims with respect to the tax reimbursements and per-diem payments. *Id.* at 1237–39. As for the in-town allowances, the Circuit disagreed with this Court's finding that Mr. Noble had failed to produce evidence that the allowances had been used for personal gain. *See id.* at

1236. The Circuit also vacated this Court's conclusion that Mr. Noble's Section 201 claim was moot. *Id.* at 1241–42.

After the case was remanded, the Court held a status hearing, decided to proceed with the existing record, and directed the parties to submit proposed supplemental findings of fact and conclusions of law, containing citation to evidence in the record, and addressing the issues before the Court on remand. *See* Minute Order of January 7, 2010. The parties have now submitted proposed supplemental findings of fact and conclusions of law. *See* Pl.'s Suppl. Proposals ("Pl.'s Proposals"), ECF No. 270; Defs.' Suppl. Proposals ("Defs.' Proposals"), ECF No. 272; Individual Defs.' Additional Suppl. Proposals ("Individual Defs.' Proposals"), ECF No. 274; Pls.' Objs. to Defs.' Suppl. Proposals ("Pl.'s Objs."), ECF No. 284.

The Court subsequently "determined that the trial exhibits that were introduced during the April 2004 bench trial are not available on the docket in this case and that any hard copies were returned to the parties sometime after the trial concluded." Minute Order of December 2, 2013. For that reason, the Court directed the parties to file copies of their trial exhibits "by no later than December 16, 2013." *Id.* The defendants filed their exhibits on December 16, 2013, but Mr. Noble repeatedly requested an extension of this deadline. The defendants did not oppose his first three extension requests,

but noted that they might oppose future requests. *See* Defs.'
Response to Third Extension Mot., ECF No. 292 at 1.

On January 20, 2014, Mr. Noble made a fourth request,
asserting that "I located all of my trial exhibits except six by
January 9, 2014." Fourth Extension Mot., ECF No. 293 at 2. The
remaining six exhibits, he said, were lost by him, and located
and provided by the NALC, but without sufficient time for Mr.
Noble to review them for accuracy. *See id.* at 2. The defendants
proposed a shorter extension, Opp. to Fourth Extension Mot., ECF
No. 294 at 2, but the Court granted Mr. Noble the full extension
to February 3, 2014, stating that "[f]urther requests for
extensions of time will be viewed with disfavor." Minute Order
of January 24, 2014.

Mr. Noble nonetheless sought a fifth extension of the deadline
for filing his exhibits, even though he had found "all of my
trial exhibits except six by January 9, 2014" and obtained the
remaining six by January 21, 2014. *See* Fifth Extension Mot., ECF
No. 295 at 1-2. He claimed that on January 28, 2014, he
discovered that *one* of the exhibits provided by the NALC was
incomplete, and that he did not receive a complete copy of that
exhibit until January 31, 2014. *Id.* at 2. Mr. Noble did not
explain how this prevented him from filing copies of the other
exhibits, which he had located by January 9, 2014. The Court
granted Mr. Noble's motion in part, directing him to file by no

later than February 5, 2014 copies of all of the trial exhibits except for Exhibit 1—the one he received on January 31, 2014. *See* Minute Order of February 4, 2014. The Court gave Mr. Noble until February 17, 2014 to file Exhibit 1. *See id.* On February 5, 2014, Mr. Noble filed only a small number of his trial exhibits. *See* Exhibits, ECF No. 296 (Plaintiff's Exhibit Nos. 2–8, 13–14, 31, 38, 75, 76, 79, 89, and 91). He filed Exhibit 1 on February 17, 2014. *See* Exhibit One, ECF No. 297.

Notwithstanding Mr. Noble's failure to comply with Court-imposed deadlines, the Court granted Mr. Noble another chance in July 2014, directing him to file a complete set of his trial exhibits by August 18, 2014. *See* Minute Order of July 14, 2014. Mr. Noble again failed to comply. On August 18, 2014, he filed a motion "to vacate the July 14, 2014 Minute Order," which requested an additional one-month extension and asked that the Court stay the case pending an election for the office of NALC President. *See* Noble Declaration, ECF No. 298-1 at 1–2. The Court denied both requests. *See* Minute Order of October 9, 2014.

The Court therefore relies on the existing record, including documents in the summary-judgment record that correspond to some of Mr. Noble's trial exhibits. Upon consideration of that record, as well as the parties' proposed supplemental findings and the applicable law, the Court finds that (1) the Mutual Benefit Association and the Health Benefit Plan are sufficiently

separate from the NALC that defendants Dunn and Vincenzi are
outside the scope of Section 501; (2) the remaining individual
defendants reasonably interpreted the NALC Constitution to
permit the in-town allowances and they used the money for union
business; and (3) the existing record is insufficient to resolve
Mr. Noble's Section 201 claim. Accordingly, the Court enters
judgment in favor of the defendants on Mr. Noble's Section 501
claims, and will direct the filing of additional pleadings
regarding his Section 201 claim.

## I.   Findings of Fact

The NALC is governed by a Constitution, which creates two
bodies for the governance of the union. *See Noble III*, 525 F.3d
at 1233. The national convention of union members meets
biennially, is empowered to amend the Constitution, and is the
union's supreme body. *Id.* The Executive Council, which is made
up of twenty-eight officers, ten of whom are resident officers
who work in Washington, D.C., is charged with running the
union's day-to-day operations. *Id.*

### A.   History of the In-Town Allowances.

The Constitution charges the Executive Council to "'act
between Conventions on all matters related to the welfare of the
Union not specifically prohibited by the membership,'" and to
"'authorize and/or ratify the payment of salaries, wages,
expenses, allowances, and other disbursements which it deems

necessary and appropriate to the purpose and functioning of this
Union, other than provided for.'" *Id.* (quoting NALC Const. art.
9, § 11(e) (1992)). Pursuant to these powers, the Executive
Council has, since the 1950s, authorized the payment of a $500
per month in-town allowance to its resident officers. *Id.* at
1234. The Executive Council reauthorized the same payments in
resolutions passed in 1975, 1977, and 1980. *Id.* at 1235.

The in-town allowances are intended "to cover the expenses
NALC officers residing in Washington, D.C. incurred in the
performance of their official duties." *Id.* These expenses
include costs for "transportation, entertainment, and other
expenses for the benefit of the Association in the Washington,
D.C., Metropolitan Area," which were estimated to "approximate,
on the average" $500 per month. 1980 Resolution, Defs.' Ex. 2,
ECF No. 288-3 at 5; *see also Noble II*, 2006 WL 2708796, at *2.
The NALC President was authorized to receive an in-town
allowance in excess of $500 per month for "all official
expenditures made by him, both in town and out of town." *Noble
III*, 525 F.3d at 1235. The $500 per month limit on in-town
expenditures has remained constant since the 1950s. *Id.* at 1234.

An officer was required to request the in-town allowance each
month the officer wished to receive it, and any officer seeking
reimbursement for over $500 was required to provide a receipt
and the express authorization of the NALC President to incur the

extra expense. *See Noble II*, 2006 WL 2708796, at *2; 1980
Resolution, Defs.' Ex. 2, ECF No. 288-3 at 6. Officers were not
required to submit receipts to receive an in-town allowance of
up to $500 per month; rather, the Resolution stated,
"[a]pplication for allowances pursuant to this Resolution
constitute[s] a representation by the applying officer or
employee that the sum requested was expended on behalf of the
Association in the course of performance of official duties."
1980 Resolution, Defs.' Ex. 2, ECF No. 288-3 at 5; *see also*
*Noble III*, 525 F.3d at 1235; Transcript of April 13, 2004 Bench
Trial, ECF No. 224 at 98:22-24 (Mr. Sombrotto: "It's assumed
that you're using it for the Union activities. That's what the
resolution is there for."). Officers were, however, required to
"personally keep their receipts for a 'reasonable period' of up
to five years." *Noble III*, 525 F.3d at 1235 (quoting 1980
Resolution, Defs.' Ex. 2, ECF No. 288-3 at 5).

**B.   Evidence of How the In-Town Allowances Were Used.**

NALC officers testified that no officer would have incurred
less than $500 per month in expenses. President Sombrotto
testified that "I don't know any officer" who claimed the $500
each month despite not having incurred at least $500 in
expenses. Transcript of April 13, 2004 Bench Trial, ECF No. 224
at 100:14-19. Indeed, testimony of NALC officials indicated that
it would be difficult for an officer to spend less than $500 in

a given month. President Young stated: "[s]ince I've been here in 1990, I'm not aware of a single resident officer that doesn't spend in excess of $500 a month for all these various things we're talking about." *Id.* at 176:24-177:12.

It nonetheless appears that NALC officers understood the resolution to permit a hypothetical officer who incurred less than $500 per month in expenses to claim the full $500 allowance. For example, when asked whether "Chuck Overby [who] suffered a stroke and was in the hospital for several months" could "draw[] $500 a month in in-town expenses," Mr. Sombrotto answered "Yeah. If he applied for it, he received it. Whether he did it or not . . . . I can't testify to that. But if he had, he would have received it." *Id.* at 103:21-104:1; *see also id.* at 96:14-19 (Mr. Sombrotto agreed that an officer could claim $500 without incurring as much in expenses, "[b]ut if you do and you don't receipt it, then you have to pay taxes"); *id.* at 179:5-10 (when asked whether "a hypothetical officer spent $100 on in-town expenses" was "entitled to $500 for the month, notwithstanding the fact that she or he spent only $100," Mr. Young responded "you get $500"). These general assertions about the in-town allowances are supplemented by additional testimony

from Presidents Sombrotto and Young, as well as receipts that
were submitted by NALC officials.[2]

President William Young submitted receipts for nearly all of
the expenses he incurred between December 1990 and July 1993.
Defs. Ex. 8, ECF No. 288-9 at A-12 (Mr. Young incurred $16,358
in expenses during this period, received $16,000 in in-town
expense allowances, and submitted receipts for $15,798 of those
expenditures); Transcript of April 13, 2004 Bench Trial, ECF No.
224 at 177:16-17 (President Young: "My initial history in the
Union from 1990 until about 1994 or 5 was to receipt
everything"); Young Receipts, Pl.'s Ex. 7, ECF No. 296-6. Mr.
Young stopped submitting receipts "because it wasn't worth the
aggravation." *Id.* at 177:17-18. He explained:

> So I just decided [for] my own benefit that I wasn't
> going to receipt much. And now I'm somewhere in between
> the two. Every now and then I'll throw in a receipt if
> it's easy, especially the ones where I use credit cards.

---

[2] Mr. Noble objects generally to the Court's consideration of the
trial testimony of Mr. Sombrotto and Mr. Young. *See* Pl.'s Objs.
at 2-3. According to plaintiff, "[t]o the extent that they
testified about what they were told by INDs other than
themselves[,] their testimony was hearsay," and "[w]hen they
testified about themselves[,] their testimony was wholly
conclusory." *Id.* The Court largely relies on testimony by Mr.
Sombrotto and Mr. Young about their own practices. Mr. Noble
does not explain why this evidence is so conclusory that the
Court cannot consider it. *See id.* To the extent that Mr. Noble
intended to object to the Court's consideration of statements
regarding Mr. Sombrotto's and Mr. Young's perceptions of other
individual's practices, the testimony relied upon by the Court
relates to their own understanding, not to what any other
officer told them. Mr. Noble does not explain why he believes
this testimony is hearsay or conclusory.

But if I just pay cash money, I'm not going to receipt
it because it isn't worth the hassle in the long run.

*Id.* at 177:24-178:4.

Mr. Young's receipts reflect, for example, expenditures on
meals with visiting union officials to discuss a potential
"prescription co-pay that could benefit [the] members," *id.* at
164:18-165:2, Christmas gifts to union secretaries, drivers, and
cooks, and expenses for mailing Christmas cards to union
officials. *Id.* at 165:3-166:3; *see also* Young Receipts, Pl.'s
Ex. 7, ECF No. 296-6. Ultimately, Mr. Young used the in-town
allowance "for any legitimate expenses that I incurred while in-
town not on an assignment from the president." Transcript of
April 13, 2004 Bench Trial, ECF No. 224 at 166:6-20.

President Sombrotto kept some receipts during the course of
his tenure as an NALC officer, ranging from some months in which
he submitted no receipts, to others in which he submitted over
$100 worth of receipts. *See* Sombrotto Receipts, Pl.'s Ex. 1, ECF
No. 297. Many of the receipts were for restaurants in
Washington, D.C., and President Sombrotto testified that these
expenses were often incurred while having dinner with Richie
O'Connell, a union officer. *See id.* at 112:8-115:13.

President Sombrotto testified that he regularly incurred
union-related expenses in excess of $500 per month. *See*
Transcript of April 13, 2004 Bench Trial, ECF No. 224 at 96:9-13

11

(Sombrotto: "I spent more than $500 a month, I guarantee you that."); Sombrotto Decl. ("2001 Sombrotto Decl."), Ex. to ECF No. 128 ¶ 15; *see also* Young Decl. ("2001 Young Decl."), Ex. to ECF No. 128 ¶ 4.[3] As President, he and President Young could have claimed an amount in excess of $500, *Noble II*, 2006 WL 2708796, at *3, but neither did. *See* Sombrotto Decl. ¶ 15; Young Decl. ¶ 4. Instead, each paid for any additional expenses out of their own pocket. *See* Sombrotto Decl. ¶ 15; Young Decl. ¶ 4.

Defendant Lawrence Hutchins submitted receipts for a large portion of his in-town expenses. *See* Investigative Committee Report, Defs.' Ex. 8, ECF No. 288-9 at A-10 (reflecting that Mr. Hutchins provided receipts for approximately $12,700 of the

---

[3] Mr. Noble objects to the Court's consideration of the November 19, 2001 declarations of defendants Sombrotto, Young, Vincenzi, and Dunn because "[e]ach of the declarations concludes with a statement that 'the foregoing is true and correct to the best of my knowledge and belief." Pl.'s Objs. at 2. Plaintiff argues that, because the declarations do not make clear "which parts were statements of knowledge and which were statements of belief," they are inadmissible under Federal Rule of Evidence 602 and 28 U.S.C. § 1746. These provisions, which seek to ensure that evidence admitted—and specifically, evidence admitted via affidavit—is within the personal knowledge of the declarant, would require a sufficient foundation for a finding that the matters discussed were within the declarants' personal knowledge. *See, e.g.*, *Lux v. Great N. Ins. Co.*, No. 12-cv-2632, 2013 WL 6076157, at *4 (D. Colo. Nov. 19, 2013) ("although the qualifier 'to the best of my knowledge' is a limitation that raises significant concern," the Court relied on the challenged affidavits where the declarant "adequately described facts which show that he has personal knowledge"). The Court accordingly relies on these declarations only for propositions that are clearly supported by such a foundation.

$18,000 he received between 1988 and 1990, and for nearly all of the $16,000 he received between 1991 and July 1993); Hutchins Receipts, ECF Nos. 296-7, 296-8, 296-9. Mr. Hutchins's receipts largely reflect expenditures at restaurants, as well as taxi and parking charges. *See* Hutchins Receipts, ECF Nos. 296-7, 296-8, 296-9. Defendant Michael O'Connor appears only to have received an in-town allowance during 1994, but the record contains receipts for over $400 of the $500 he received each month. *See* O'Connor Receipts, Pl.'s Ex. 6, ECF No. 296-5. Mr. O'Connor's receipts related to restaurants, taxis, and parking. *See id.*

The record contains no evidence regarding defendants Souza and Worsham, who appear never to have received an in-town allowance because they did not reside in Washington, D.C. *See* 2001 Sombrotto Decl. ¶ 6 (noting that Souza and Worsham "while not 'Resident Officers,' were members of the Executive Council"). The remaining individual defendants, Francis Connors, Richard O'Connell, George Davis, and Walter Couillard have died during the course of this litigation. *See supra* at 1 n.1.[4]

---

[4] The record contains minimal evidence regarding these defendants' use of in-town expenses, with the exception of Francis Conners. *See* Transcript of April 13, 2004 Bench Trial, ECF No. 224 at 119:10-24; Frank Conners Receipts, Pl.'s Ex. 5, ECF No. 296-4. President Young testified that Mr. Conners "made the decision for his own reasons, and I don't know what they were, not to receipt anything. Just to go ahead and pay the taxes rather than go through the hassle of writing on the receipts who he's entertaining, what it was about, where he was,

**C.    The In-Town Allowances Provided by the Mutual Benefit
Association and the Health Benefit Plan.**

The Mutual Benefit Association and the Health Benefit Plan are

"separate and distinct" from the NALC. *See Noble II*, 2006 WL

2708796, at *7; *see also Noble III*, 525 F.3d at 1237 (noting

that this factual finding is "conclusive on remand"). Indeed,

the plans each have their own constitution, separate from the

NALC constitution. Transcript of April 14, 2004 Bench Trial, ECF

No. 225 at 73:1-11. They are governed separately, and have

separate offices and staff. *See id.* at 72:19–22, 75:2–4;

Vincenzi Decl. ("2001 Vincenzi Decl."), Ex. to ECF No. 128 ¶ 4;

Dunn Decl. ("2001 Dunn Decl."), Ex. to ECF No. 128 ¶ 3.

The Mutual Benefit Association is incorporated in Tennessee.

Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 72:19-

25; Dunn Decl. Ex. A. It is a fraternal benefit corporation that

offers life and disability insurance, and receives its funds

through the sale of those insurance policies, as well as through

investment income earned through investing the premiums.

Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 72:19-

73:19; Dunn Decl. ¶ 4.

Defendant William Dunn served as the NALC's Director of

Insurance, which made him Director of the Mutual Benefit

---

all of that." Transcript of April 13, 2004 Bench Trial, ECF No.
224 at 176:20-177:9.

Association, until 1994. Dunn Decl. ¶ 2. Mr. Dunn's role was governed by the Mutual Benefit Association's Constitution. *Id.* ¶ 5. His salary, benefits, business expenses, and $500 per month in-town allowance were all paid by the Mutual Benefit Association, not the NALC. Dunn Decl. ¶¶ 4, 6; Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 73:25-74:6. Mr. Dunn used his in-town allowance on various business-related expenditures, including transportation and meals with union officials. Dunn Decl. ¶ 9.

The Health Benefit Plan is "part of the federal employee health benefit plan operated under rules promulgated by the Office of Personnel Management" and makes its money by selling insurance policies "to members of [the NALC] and other federal employees." Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 74:13-19. Mr. Vincenzi served as the Health Benefit Plan's director from 1986 until 1994. Vincenzi Decl. ¶ 2. His duties were governed by the Plan's Constitution. *Id.* ¶ 5. Mr. Vincenzi's salary, benefits, and in-town allowances were paid by the Health Benefit Plan from its funds. *Id.* ¶¶ 6, 7; Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 75:5-24. Mr. Vincenzi spent the allowance on union-related business at restaurants, as well as for transportation and the costs of hosting colleagues at his home to discuss union business. *Id.* ¶ 9.

D.    **Discussion and Authorization of the In-Town Allowances at NALC National Conventions.**

The in-town allowances were discussed during a number of NALC National Conventions. *See Noble III*, 525 F.3d at 1234, 1237.

First, during the 1976 National Convention, when James Rademacher was President, a delegate named John Bourlon informed the Convention that "I am advised that sometime in 1975 the Executive Council approved the expenditure for the National Officers for in-town expenses" and that "they will be allowed $500 and it does not say if they list it on an expense account. It says they will be given $500." Minutes of 1976 NALC Convention, Pl.'s Ex. 13, ECF No. 296-10 at 1–2. President Rademacher responded "[w]ell, your information is incorrect. The Chair stands here in front of 5,000 delegates and says your information is incorrect." *Id.* at 2. The Resolution in existence at that time permitted resident officers "to draw up to $500.00 each month as an allowance for official in-town expenses," stated that "[a]pplication for allowances pursuant to this Resolution constitute[s] a representation . . . that the sum requested was expended on behalf of the Association in the course of performance of official duties," and made it "the responsibility of each officer . . . to make and preserve for a reasonable period, not exceeding five years, records and receipts." 1975 Resolution, ECF No. 288-9 at 32–33.

In 1980, soon after Vincent Sombrotto became President, the
Executive Council reauthorized the in-town allowances. *See* 1980
Resolution, Defs.' Ex. 2, ECF No. 288-3. That resolution
recognized that "resident officers . . . in the performance of
their official duties are expected to and regularly do incur and
pay transportation, entertainment, and other expenses for the
benefit of the Association in the Washington, D.C., Metropolitan
Area, in amounts which are estimated to approximate, on the
average [$500]." *Id.* at 5. Just like the prior resolutions, the
1980 Resolution made any application for an in-town allowance "a
representation by the applying officer or employee that the sum
requested was expended on behalf of the Association in the
course of performance of official duties" and required officers
"to make and preserve for a reasonable period, not exceeding
five years, records and receipts of expenditures covered by
allowance for examination by the Fiscal Committee and by any
other legally authorized authority." *Id.* at 5-6.

The in-town expenditures were not discussed again until the
1986 National Convention, when the following discussion occurred
in connection with a debate over a proposal to increase the
salaries of NALC officers:

> DELEGATE LIPPE: . . . I personally believe that all the
> national officers deserve a salary increase. However, I
> want to take a look at what it is that we are going to
> decide today. You have always said that you want the
> membership to be completely informed, and I have some

information that I would like them to know. Based on the
figure of $65,038, which is currently in the
Constitution, there are some unseen salary increases
that the membership needs to be made aware of. In
addition to the salary of $65,038, the Constitution
provides for the membership to pay for the
noncontributory retirement program. Based on that
figure, the number is $14,959. Additionally, the NALC
pays 7 percent of all national officers' salary into
their civil service retirement fund based on the $65,000
figure. That cost is approximately $3,500. Additionally,
the NALC pays both sides of the Social Security taxes,
7.15 percent, which is approximately $3,003.
Additionally, all resident national officers receive a
sum of $6,000 per annum unaccountable expense money. If
you add to the salary of $65,038, the $14,000 as well as
the other benefits that are paid by the Union, the salary
is $90,750. . . .

PRESIDENT SOMBROTTO: Thank, you Sister. (Applause.)
Microphone No. 1 on privilege.

DELEGATE MCNULTY: Gene McNulty, Branch 9, Minneapolis.
I would like to correct the Sister. As a National
Business Agent and one of your employees, you do not pay
for the 7 percent of the retirement contribution. That
is taken out of my check just like it is taken out of
yours. Also, another piece of misinformation by the
Sister, there is not for the resident national officers
$6,000 unaccountable. They have to account for that. If
you don't believe me, check with the IRS.

PRESIDENT SOMBROTTO: Microphone No. 2, against.

Minutes of 1986 NALC Convention, Defs.' Ex. 11, ECF No. 288-

12 at 2.

In 1994, the NALC Convention rejected proposed amendments that

would have limited the Executive Council's ability to authorize

salaries, wages, expenses, allowances, and other disbursements

for itself. *See Noble II*, 2006 WL 2708796, at *6; Minutes of

1994 NALC Convention, Defs.' Ex. 12, ECF No. 288-13 at 4-5. The

1996 Convention rejected similar amendments. *See* Minutes of 1996
NALC Convention, Defs.' Ex. 13, ECF No. 288-14 at 3–5. The 1996
Convention also adopted a resolution—by a vote of 3,952 to 541—
that specifically confirmed that the payment of the in-town
allowances comported with the NALC Constitution. *See id.* at 6
(resolution stating "[t]hat the following NALC past practice
payments are hereby approved and confirmed: 1. Up to $500 per
month allowance to Resident Officers for in-town expenses").

### E.    Mr. Noble's Internal Charges Against the NALC and Requests for Documents.

Mr. Noble sent a letter on August 16, 1993, asking the NALC to
permit him to inspect "any and all documents, receipts, records,
bills, checks, ledgers, account books, petty cash receipts,
charge slips, minutes, and resolutions that relate to the
violations set forth in the enclosed charges and described
above." August 16, 1993 Letter from David Noble to Vincent
Sombrotto, Pl.'s Ex. 31, ECF No. 296-12 at 3. He justified this
request as based on his concerns regarding "discrepancies
between the constitutionally authorized amounts of compensation
and expenses payable to [NALC officers] . . . and the amounts
disclosed under oath to the Department of Labor on the NALC's
LM-2 Reports for the years 1984 through the present." *Id.* at 1.

President Sombrotto responded to Mr. Noble on August 31, 1993.
*See* August 31, 1993 Letter from Vincent Sombrotto to David

Noble, Ex. Q to NALC's Mot. for Summ. J., ECF No. 126.[5] While he maintained the NALC's right to object that Mr. Noble "ha[d] not established just cause for such review within the meaning of . . . 29 U.S.C. 431(c)," President Sombrotto stated:

> [T]here will be made available for your examination, at NALC Headquarters on or after September 13, 1993, copies of NALC records which are relevant to your charges and necessary to verify the NALC's LM-2 reports for 1988-1993. Please telephone Jerry Gutshall to arrange an appointment to examine these records.

*Id.*

Before taking President Sombrotto up on this offer, Mr. Noble wrote to Jerry Gutshall on September 14, 1993. *See* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 1. Mr. Noble's September 14, 1993 letter vastly expanded the scope of documents he sought to review. Mr. Noble listed eighteen categories of documents in total. *See* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 1-3. Some related to the salary issues Mr. Noble had previously raised, while others raised entirely new issues. *See id.* On October 7, 1993, Mr. Noble reviewed NALC records in person. *See* Noble Decl., ECF No. 215 ¶ 58.

---

[5] This letter appears to have been Mr. Noble's Exhibit No. 34. *See* Pl.'s Post-Trial Proposed Findings, ECF No. 241-3 at 29 n.102.

The Investigating Committee convened by President Sombrotto ultimately "confirmed that Noble's complaints were based in fact" and "presented its findings to the special [NALC] convention on October 13, 1993." *Noble III*, 525 F.3d at 1234; *see also* Investigating Committee Report, Defs.' Ex. 8, ECF No. 288-9. "Delegates to the special convention roundly rejected each of Noble's charges of wrongdoing by an average margin of 25 to 1." *Noble III*, 525 F.3d at 1234. Mr. Noble then wrote to President Sombrotto on November 7, 1993 to request "the videotape and a copy of the transcript of the October 13th Special Meeting of the Convention," as well as "copies of payroll registers for several officers for the years 1988 through 1993." November 7, 1993 Letter from David Noble to Vincent Sombrotto, Ex. V. to NALC's Mot. for Summ. J., ECF No. 126.[6] President Sombrotto denied both requests on November 30, 1993. *See* November 30, 1993 Letter from Vincent Sombrotto to David Noble, Ex. W to NALC's Mot. for Summ. J., ECF No. 126.[7]

**F.   Mr. Noble's Discovery Requests During this Case.**

---

[6] This letter appears to have been Mr. Noble's Exhibit No. 28. *See* Pl.'s Post-Trial Proposed Findings, ECF No. 241-3 at 29 n.104.

[7] This letter appears to have been Mr. Noble's Exhibit No. 39. *See* Pl.'s Post-Trial Proposed Findings, ECF No. 241-3 at 30 n.105.

In his February 26, 2002 declaration in support of his motion
for summary judgment, Mr. Noble asserted that "NALC has not yet
provided me with all of the material it indicated in discovery
that it would furnish." February 26, 2002 Noble Decl., ECF No.
139 ¶ 16. He elaborated: "For example, NALC has not yet provided
me with: a) videotapes of the 1986 convention debate concerning
officers' salaries, b) videotapes of the 1993 special
convention, c) transcripts or tape recordings of all of the
witnesses who appeared before the investigating committee, d)
copies of Bill Young's in-town expense applications." *Id.* Mr.
Noble also stated that he had "attempted to use discovery to
develop information about the Minneapolis regional office's
unauthorized bank account," and that "[w]hen and if the court
orders NALC to permit me to inspect records in order to verify
NALC's LM-2 reports I will use that opportunity to develop more
information." *Id.* ¶ 52.

Shortly thereafter, the Court denied the parties' cross
motions for summary judgment and issued an Order directing the
parties "to file a single, concise, specific, and final
statement of each party's outstanding requests for documents or
other tangible evidence, as well as efforts made to date to
obtain them, by no later than October 31, 2002, and responses
thereto by no later than November 15, 2002." Order, ECF No. 151.
On October 31, 2002, Mr. Noble asserted that he had "no

outstanding discovery requests to the individually named defendants" and only "four outstanding discovery requests to defendant NALC." Pl.'s Discovery Statement, ECF No. 152 at 1. Those four requests were for: (1) "transcripts and audio tapes of witnesses who testified before an internal NALC committee"; (2) "video tapes of the October 1993 special convention"; (3) "video tapes of the third session of the 1986 convention"; and (4) "in-town expense applications for the individually named defendants." *Id.* at 2. Mr. Noble listed no other documents.

On November 15, 2002, the defendants jointly responded to Mr. Noble's statement. *See* Defs.' Second Joint Discovery Statement, ECF No. 154. They indicated that they had given Mr. Noble the opportunity to inspect all responsive documents in 1996 and that Mr. Noble "requested and received copies of the produced documents." *Id.* at 3. After a 1999 hearing before Magistrate Judge Kay, defendants claimed, they offered to let Mr. Noble inspect documents again, he "reviewed the documents between March 5 and 8, stated that he would like to continue reviewing the files on March 29," but "did not appear on March 29 . . . and cancelled another date arranged for April 6" and then "never reappeared to continue his review of documents." *Id.* at 5.

On March 31, 2003, the Court issued an Order regarding these discovery matters. *See* Order, ECF No. 155. The Court ordered the defendants to "make the documents, videotapes and transcripts

identified as the subject of outstanding discovery requests by
Mr. Noble in his October 15, 2002 submission to the Court
available to Mr. Noble for viewing by no later than April 28,
2003, for a period of five business days ending on May 2, 2003."
*Id.* at 2. The Court further directed Mr. Noble to "provide
defendants with a specific list of documents, tapes and
videotapes he wishes to obtain copies of by no later than May
15, 2003, along with reasonable payment as agreed to by the
parties for those copies." *Id.* Finally, the Court directed the
defendants to "provide plaintiff with all copies of documents,
tapes and videotapes requested and paid for by plaintiff by no
later than May 30, 2003." *Id.* The NALC asserts that it "fully
complied with that Order; [Mr.] Noble has never claimed
otherwise." Defs.' Proposals at 9. Mr. Noble does not contest
this assertion. *See generally* Pl.'s Objs.

## II.  Conclusions of Law

### A.  Mr. Noble's Section 501 Claims

Mr. Noble's remaining Section 501 claim relates to the in-town
expenditures. Before addressing the merits of the claim, the
Court must assess which defendants remain subject to it.

*First*, the claim cannot be made against the NALC directly
because "claims made pursuant to Section 501 of the LMRDA cannot
be brought against labor organizations . . . but rather can be
made only against officers acting in their official capacities."

*Saunders v. Hankerson*, 312 F. Supp. 2d 46, 58 (D.D.C. 2004); *see also Sabolsky v. Budzanoski*, 457 F.2d 1245, 1249 (3d Cir. 1972); *Pignotti v. Local No. 3 Sheet Metal Workers' Int'l Ass'n*, 477 F.2d 825, 832 (8th Cir. 1973); *Commer v. McEntee*, 145 F. Supp. 2d 333, 339-40 (S.D.N.Y. 2001), *aff'd in relevant part sub nom. Commer v. Giuliani*, 34 F. App'x 802, 805 (2d Cir. 2002). Nor does Mr. Noble appear to press this claim as to the NALC. *Compare* First Am. Compl., ECF No. 25 ¶¶ 115-19 (bringing the Section 501 claims against the NALC), *with* Pl.'s Proposals at 3 (discussing only the individual defendants in connection with the claim).

*Second*, five of the twelve individual defendants have died during the course of this litigation and were dismissed, without objection by Mr. Noble or any attempt to file a motion to substitute. *See supra* at 1 n.1. In light of that, Mr. Noble's Section 501 claims against those individuals—Vincent Sombrotto, Francis Conners, Walter Couillard, George Davis, and Richard O'Connell—are no longer part of the case.[8]

---

[8] *See, e.g., Cowger v. Rohrbach*, 734 F. Supp. 914, 916 (C.D. Cal. 1990) ("The goals which underlie the LMRDA and the practicalities of a trial necessarily involving uniquely individual actions lead [the court] to the conclusion that justice is best served by abatement of this [Section 501] cause of action."); Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper parties," but "[i]f the motion [for substitution] is not made within 90 days after service of a statement noting the

*Third*, Mr. Noble never raised a Section 501 claim against defendants Souza and Worsham related to in-town expenses. *See* 1993 Investigation Report, Defs.' Ex. 8, ECF No. 288-9 at 3 (list of officials Mr. Noble had charged internally with accepting the in-town allowances, which does not include defendants Souza or Worsham); First Am. Compl., ECF No. 25 ¶ 8 (Souza and Worsham were not listed as NALC "resident officers"); *id.* ¶¶ 115-19 (Souza and Worsham were omitted from Count II, which raises a Section 501 claim regarding the in-town expenses). They are therefore not subject to this claim.

Accordingly, Mr. Noble's Section 501 claim relates only to William Dunn, Lawrence Hutchins, Michael O'Connor, Robert Vincenzi, and William Young. Defendants Dunn and Vincenzi argue that they cannot be subject to a Section 501 claim because they are not union officials, and the Court addresses this argument first. After finding that defendants Dunn and Vincenzi are correct, the Court analyzes Mr. Noble's Section 501 claims against defendants Hutchins, O'Connor, and Young.

     *1.   Officers of the Mutual Benefit Association and Health Benefit Plan Are Outside the Scope of Section 501.*

Section 501(a) of the LMRDA defines the duty owed by "[t]he officers, agents, shop stewards, and other representatives of a

---

death, the action . . . against the decedent must be dismissed.").

labor organization" to "such organization and its members as a
group." 29 U.S.C. § 501(a). The Act therefore requires covered
individuals, "taking into account the special problems and
functions of a labor organization, to hold its money and
property solely for the benefit of the organization and its
members and to manage, invest, and expend the same in accordance
with its constitution and bylaws and any resolutions of the
governing bodies adopted thereunder." *Id.* The D.C. Circuit
directed this Court to consider on remand whether defendants
Dunn and Vincenzi, as officers of the Mutual Benefit Association
and Health Benefit Plan, are subject to Section 501. *See Noble
III*, 525 F.3d at 1237. This Court had previously found the
Mutual Benefit Association and Health Benefit Plan to be
"separate and distinct" from the NALC, *Noble II*, 2006 WL
2708796, at *7, a finding the D.C. Circuit noted was "conclusive
on remand." *Noble III*, 525 F.3d at 1237. Nonetheless, the
Circuit stated that "the degree of separation necessary to avoid
§ 501's application is itself uncertain." *Id.*

   Mr. Dunn and Mr. Vincenzi argue that they are not covered by
Section 501 because their in-town expenditures were paid using
funds of the Mutual Benefit Association and Health Benefit Plan,
not the NALC. *See* Individual Defs.' Proposals at 6-8. Although
the D.C. Circuit remanded for this Court to consider this issue,
Mr. Noble did not mention it in his proposed supplemental

27

findings. *See generally* Pl.'s Proposals. Nor did he respond in his opposition brief to the defendants' arguments on this point. *See generally* Pl.'s Objs. For this reason, Mr. Noble has conceded that defendants Dunn and Vincenzi are outside the scope of Section 501. *See, e.g.*, *McGinnis v. District of Columbia*, No. 13-1254, 2014 WL 4243542, at *15 (D.D.C. Aug. 28, 2014) (when a party "fails to address [an argument] in its motion and fails to respond to [an opposing party's] point in its reply, the Court will deem it abandoned").

In any event, the Court finds that the Mutual Benefit Association and Health Benefit Plan are sufficiently distinct from the NALC that their officers are not covered by Section 501(a) with respect to their in-town allowances. Claims under Section 501(a) "may only relate to the misuse of union funds." *Hearn v. McKay*, No. 07-60209, 2008 WL 2694005, at *4 (S.D. Fla. July 1, 2008), *aff'd* 603 F.3d 897 (11th Cir. 2010). For that reason, a Section 501(a) claim may not be made in connection with allegations of misuse of funds in benefit plans that "are not union funds." *Id.* As another Judge of this Court has held, "Section 501 only applies to activities affecting union money," so such a claim may not be brought with respect to "money in the Plan [that] was no longer property of the union." *Yager v. Carey*, 910 F. Supp. 704, 728 (D.D.C. 1995). This conclusion flows from the plain language of the statute, which applies only

to "officers, agents, shop stewards, and other representatives *of a labor organization*" and dictates that, with respect to that labor organization, the officers must use "*its money and property* solely for the benefit of the organization and its members and to manage, invest, and expend *the same* in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder." 29 U.S.C. § 501(a) (emphasis added).

Trustees of employee-benefit plans that are related to unions will therefore be outside the scope of Section 501(a) when "the funds in these plans are not union money or property but rather the property of the plans or trusts." *Hearn*, 2008 WL 2694005, at *4 (documents establishing the plan "state[d] that the union does not 'have any right, title or interest in or to the Fund, or any part thereof,'" and that "[o]nce funds are transferred into these plans they are part of an 'irrevocable trust' and 'assets of the Plan.'"); *see also Yager*, 910 F. Supp. at 728 ("the Plan is funded by the [union] on behalf of its affiliates," but "once the [union] makes a payment to the plan, 'that money belongs to the . . . Plan and is no longer [union] property"). Both the Mutual Benefit Association and Health Benefit Plan receive their funds through their own activities, rather than from the union. *See* Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 72:19-73:19, 74:13-19; Dunn Decl. ¶

4. The in-town allowances of Mr. Dunn and Mr. Vincenzi, moreover, were paid entirely by their respective plans, not by the NALC. *See* Dunn Decl. ¶¶ 4, 6; Vincenzi Decl. ¶¶ 6, 7; Transcript of April 14, 2004 Bench Trial, ECF No. 225 at 73:25-74:6, 75:5-24. Accordingly, the in-town allowances of defendants Dunn and Vincenzi were not paid for using union funds and therefore any claim against them alleging the misuse of those funds cannot be brought under Section 501.

This conclusion is bolstered by the possibility that trustees of such plans may be "subject to their own fiduciary requirements under the Employment Retirement Income Security Act, [29 U.S.C. § 1001, *et seq.*]" *Hearn*, 2008 WL 2694005, at *4. If so, ERISA makes such plans "distinct legal entities separate from the union . . . controlled exclusively by the trustees for the benefit of the plan participants and beneficiaries." *Hearn*, 603 F.3d at 902 (citing 29 U.S.C. §§ 1104(a)(1), 1132(d)). "When a plan's assets are misused, the breach of duty is one between the trustees and the plan's beneficiaries (a separate constituency from the union and its members as a group)." *Id.* Nor would the fact that a plan trustee is also a union officer affect the analysis. "[A]n employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 334 (1981); *see also Hearn*,

603 F.3d at 902–03 ("when a union official is acting in his role as an ERISA benefit plan trustee, he does so exclusively for the benefit (or to the detriment) of the plan participants and beneficiaries, not the union or its members as a group").[9]

> 2.   *Mr. Noble's Section 501 Claims Against Defendants Hutchins, O'Connor, and Young Fail.*

Mr. Noble's in-town-expense claim thus remains only as to three individuals: Lawrence Hutchins, Michael O'Connor, and William Young. Mr. Noble's claim that their in-town allowances were not properly authorized cannot stand if the in-town allowances were made "in accordance with [the union's] constitution and bylaws and any resolutions of the governing bodies adopted thereunder." 29 U.S.C. § 501(a). The D.C. Circuit has affirmed that, in evaluating whether an action comports with

---

[9] The Court is not persuaded by pre-ERISA cases involving plans that "were an exclusively union undertaking." *Hearn II*, 603 F.3d at 903 n.8 (describing *Hood v. Journeyman Barbers, Hairdressers, Cosmetologists & Proprietors Int'l Union*, 454 F.2d 1347 (7th Cir. 1972) and *Morrissey v. Curran*, 423 F.2d 393 (2d Cir. 1970)). Pre-ERISA decisions are especially unpersuasive because "ERISA obviated the need for federal courts to strain to imply a cause of action in favor of employee benefit fund participants and beneficiaries." *Hearn*, 2008 WL 2694005, at *5 (quotation marks omitted). Nor is the Court persuaded by *Morrissey v. Curran*, 650 F.2d 1267 (2d Cir. 1981), where allegedly improper payments from a pension fund jointly run by a union and its members' employers fell within the scope of Section 501 because the pension fund's assets "belong to union members." *Id.* at 1284. By contrast, the Mutual Benefit Association and Health Benefit Plan both sell to non-members, and their funds come not from union or member contributions, but from the payment of insurance premiums and investments of those premiums.

a union's constitution and bylaws, the Court must "defer to an interpretation of a union constitution rendered by officials of a labor organization . . . unless the court finds the interpretation was unreasonable or made in bad faith." *Noble III*, 525 F.3d at 1235 (quotation marks omitted; alteration in original). This deference is even greater "when, as here, a union convention has approved the officers' interpretation of the union constitution because such approval undermines a finding that the officers' interpretation was unreasonable and made in bad faith." *Id.* (quotation marks and alteration omitted); *see also Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984). This deference takes into account "whether there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight." *Stelling v. Int'l B'hood of Elec. Workers*, 587 F.2d 1379, 1389 n.10 (9th Cir. 1978).

This Court previously concluded that Article 9, § 11(e) of the NALC Constitution could reasonably be viewed as authorizing the individual defendants' actions. *See Noble II*, 2006 WL 2708796, at *8-9. This holding was based on the following provisions:

- "Second only to the Convention in legislative and policy-making authority, [the Executive Council] shall act between Conventions on all matters related to the welfare of the Union not specifically prohibited by the membership."

- "[The Executive Council may] authorize and/or ratify the payment of salaries, wages, expenses, allowances, and other

32

disbursements which it deems necessary and appropriate to
the purpose and functioning of this Union, other than
provided for."

*Id.* Because the NALC Constitution does not "specifically

prohibit or otherwise provide for the payment of either an in-

town expense allowance or the reimbursement of un-itemized

expenses," this Court agreed with the defendants that the above

provisions had been "reasonably interpreted . . . to permit a

$500 per month in-town expense allowance resolution for Resident

Officers" and that "the Council's determinations for many years

that it would not require Resident Officers to submit receipts

for in-town expenses were reasonable and made in good faith."

*Id.* at *9.

The D.C. Circuit "agree[d] . . . that the NALC constitution

was ambiguous." *Noble III*, 525 F.3d at 1236. It held that

"[t]hough NALC Const. art. 6 § 1 expressly entitles all elected

union officers to obtain reimbursement of itemized expenses,

that minimum entitlement does not unambiguously prohibit the

council from providing additional payment for expenses or

allowances" and that other provisions relied upon by Mr. Noble

do not "unambiguously require[] a contrary interpretation." *Id.*

Accordingly, the Circuit agreed with this Court's application of

a "more deferential standard of review in evaluating the

reasonableness of the NALC Executive Council's interpretation of

their authority to authorize the expenses." *Id.* The individual

defendants' interpretation of the NALC Constitution to permit the in-town expense allowance was therefore reasonable under the deferential standard applicable to this case, giving them arguable authority for accepting $500 per month pursuant to the resolution for use in connection with union-related business in Washington, D.C.

The D.C. Circuit reversed this Court's dismissal of Mr. Noble's claim because it disagreed with the factual finding that Mr. Noble "produced no evidence that officers had used the allowance for purely personal reasons, unrelated to union business." *Id.* at 1236 (quotation marks omitted). Although no direct evidence of misuse had been provided, the Circuit held that personal use may be proven by indirect evidence. *See id.* at 1236–37. Mr. Noble, the Circuit found, had produced two relevant forms of circumstantial evidence: (1) the evidence of bad faith provided by two misleading statements by NALC officers regarding the in-town allowances, and (2) defendants' failure to submit receipts despite the resolution's requirement that they retain receipts for a reasonable period and their "direct financial incentive" to do so. *See id.* The Circuit directed this Court on remand to "weigh[] Noble's circumstantial evidence of misuse against any evidence the officers present to the contrary." *Id.* at 1237.

    a.    The Statements at the 1976 and 1986 NALC Conventions

This Court's analysis is framed by two statements made during NALC National Conventions held a decade apart, which arguably support an inference of "bad faith regarding the in-town expense allowance." *Id.* As the Circuit summarized it: "The evidence Noble presented showing that NALC presidents twice misleadingly denied the allowance's existence when challenged on the issue at National Conventions is troubling." *Id.* The Circuit therefore directed this Court to apply *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), "which suggests that courts should closely scrutinize self-serving courses of conduct when union officers conceal vital information from union members." *Noble III*, 525 F.3d at 1237.

*DeFries* arose in connection with criminal proceedings against individuals who had been officers of a union that subsequently merged with another union. *See* 129 F.3d at 1297. Those officers, pursuant to the merger agreement, became officers in the new union. *Id.* Despite this, the officers received severance payments totaling $2,000,000 upon consummation of the merger, as a result of a severance plan adopted by the former union's leadership committee. *Id.* In assessing the officers' contention that the severance plan was permitted by the union's bylaws, the D.C. Circuit noted that the officers had "t[aken] steps to conceal from the union membership the adoption, terms, and

triggering event of the plan." *Id.* The officers "failed to mention the plan in the minutes of the meeting at which they adopted it, direct[ed] the union's controller not to reveal any details of the plan," and "failed to disclose the plan's existence to the union's independent auditor until more than a year after its adoption." *Id.* Moreover, the Circuit noted, "the membership was kept completely in the dark as to any of [the severance plan's] details until after the unions were merged and the payments were made." *Id.* at 1307. Accordingly, the D.C. Circuit held, "the membership was prevented through [the officers'] subterfuge from exercising its ultimate authority to prevent this looting of the union treasury, and authorization secured without disclosure of material information is a nullity." *Id.* (quotation marks and alteration omitted). The situation in this case is not as clear as *DeFries*.

The first statement at issue here is indeed troubling. In 1976, then-President Rademacher appeared to deny the existence of "in-town expenses" for which officers were "allowed $500," without needing to "list it on an expense account" while speaking to the National Convention. Minutes of 1976 NALC Convention, Pl.'s Ex. 13, ECF No. 296-10 at 1–2; *see id.* at 2 (President Rademacher's response: "Well, your information is incorrect. The Chair stands here in front of 5,000 delegates and says your information is incorrect."). No reading of the in-

town-expense resolution in existence at the time can be squared with this statement. *See* 1975 Resolution, ECF No. 288-9 at 32–33.

President Rademacher's statement, then, bears some resemblance to the concealment found in *DeFries*. To be sure, there is no evidence that President Rademacher or his officers engaged in additional conduct that was also present in *DeFries*: There is no evidence that the in-town allowances were omitted from any meeting minutes or other official records, and no evidence exists that auditors or other officials were kept in the dark or instructed to keep the allowances quiet. Nonetheless, President Rademacher's statement denies the existence of the payments.

The key difference between this statement and the defendants' actions in *DeFries* is that President Rademacher is not a defendant in this case, and the individuals who are defendants in this case were officers during the administration of President Sombrotto, which occurred five years later and after the intervening administration of President Vaca. The in-town allowances authorized by President Sombrotto and at issue in this case were made pursuant to a 1980 Resolution, which superseded President Vaca's 1977 Resolution, which itself superseded the 1975 Resolution in effect when President Rademacher spoke in 1976. President Rademacher's statement surely sets the stage for concern, especially in light of the

similarity between the 1975, 1977, and 1980 Resolutions, but unlike the actions in *DeFries*, it is not probative of the intent of the defendants in this case and therefore makes it difficult to infer, as the D.C. Circuit could in *DeFries*, that the defendants sought to conceal the payments.

The statements during the 1986 National Convention are less clear. A delegate, Karen Lippe, was speaking in favor of providing a more modest salary increase to NALC officers than had been proposed. She sought to make clear the additional non-salary compensation that NALC officers were receiving, and in the process mentioned: (1) "pay for the noncontributory retirement program"; (2) "7 percent of all national officers' salary into their civil service retirement fund"; (3) "both sides of the Social Security taxes"; and (4) "a sum of $6,000 per annum unaccountable expense money." Minutes of 1986 NALC Convention, Defs.' Ex. 11, ECF No. 288-12 at 2. President Sombrotto at this time was essentially moderating the debate on the proposed salary increase, by alternately calling on individuals in favor of and against the proposal based upon which microphone they were standing at. *See id.* After Delegate Lippe spoke, President Sombrotto stated "[t]hank, you Sister," the audience applauded, and President Sombrotto recognized "Microphone No. 1 on privilege." *Id.* Another delegate, Gene McNulty, stated:

> I would like to correct the Sister. As a National
> Business Agent and one of your employees, you do not pay
> for the 7 percent of the retirement contribution. That
> is taken out of my check just like it is taken out of
> yours. Also, another piece of misinformation by the
> Sister, there is not for the resident national officers
> $6,000 unaccountable. They have to account for that. If
> you don't believe me, check with the IRS.

*Id.* President Sombrotto then recognized "Microphone No. 2,

against." *Id.*

The effect of this dialogue is much less clear than President

Rademacher's 1976 denial of the existence of the payments. No

one in 1986 disputed that the payments existed or that they

amounted to $500 per month. The dialogue thus cannot be read as

evidence that anyone sought to hide the payments or their

amounts. The misstatement was Delegate McNulty's when he stated

that NALC officers "have to account for" the in-town allowances.

Delegate McNulty is not a defendant in this case, so it is

difficult to attribute his statement to the remaining individual

defendants. President Sombrotto did not step in to correct

Delegate McNulty's statement, but neither did he ratify it.[10]

At most, then, the in-town allowances had been concealed by a

prior administration, and described by the administration with

which the individual defendants are affiliated as if they

---

[10] The Court notes, moreover, that President Sombrotto is no
longer a defendant in this case, further attenuating the
connection between the 1986 dialogue and the intent of the
remaining individual defendants.

required "accounting," when in fact they did not. This differs
enough from *DeFries* that the Court cannot say that these
individual defendants—Lawrence Hutchins, Michael O'Connor, and
William Young—sought to conceal the existence of the challenged
payments. At the same time, the history of prior concealment and
the confusion about accounting in 1986 paint a picture that
counsels in favor of a more careful review of how the individual
defendants used their in-town allowances.

> b.   Direct Evidence of How Defendants Hutchins,
>      O'Connor, and Young Used the In-Town Allowances

With this framework in mind, the Court reviews Mr. Noble's
additional circumstantial evidence of misuse. This evidence
stems from the incentive officers faced to keep receipts, based
in the Resolution itself, which tasked them with "mak[ing] and
preserv[ing] for a reasonable period, not exceeding five years,
records and receipts of expenditures covered by allowance for
examination by the Fiscal Committee and by any other legally
authorized authority." 1980 Resolution, ECF No. 288-3 at 5–6. So
tasked, an officer had a financial incentive to submit such
receipts because any portion of the in-town expense for which a
business-related receipt was provided would be exempt from
income taxation. *See Noble III*, 525 F.3d at 1236.

Against this circumstantial case, the Court must weigh the
evidence presented by the individual defendants in support of

their contention that they did not misuse the in-town
allowances. At least with respect to defendants Hutchins,
O'Connor, and Young, direct evidence rebuts this circumstantial
evidence and shows that these three defendants used their in-
town allowances for union-related business.

Of the three remaining defendants, the record is most
illuminating as to the practices of President William Young.
President Young submitted receipts—largely reflecting meals and
transportation expenses—for nearly all of the expenses he
incurred between December 1990 and July 1993. Defs. Ex. 8, ECF
No. 288-9 at A-12 (Mr. Young incurred $16,358 in expenses during
this period, received $16,000 in in-town expense allowances, and
submitted receipts for $15,798); Transcript of April 13, 2004
Bench Trial, ECF No. 224 at 177:16-17 (President Young: "[My]
initial history in the Union from 1990 until about 1994 or 5 was
to receipt everything"); Young Receipts, Pl.'s Ex. 7, ECF No.
296-6. Mr. Young later chose to stop submitting receipts
"because it wasn't worth the aggravation." *Id.* at 177:17-18.
Thus, although there was a financial incentive to submit
receipts for the $500 or more President Young incurred in the
course of his official duties—and President Young had for years
been incurring that amount and saving receipts in response to
that incentive—he decided "[for] my own benefit that I wasn't
going to receipt much. . . . [B]ecause it isn't worth the hassle

in the long run." *Id.* at 177:24-178:4. President Young's prior practice over the course of several years of providing receipts for nearly every dollar he received strongly supports the inference that he stopped submitting receipts for the reason he gave: the inconvenience of preparing them, not because he was suddenly able to do his job while incurring fewer expenses and decided to pocket the difference.

Defendant Lawrence Hutchins similarly submitted receipts for a substantial portion of his in-town expenses. *See* Investigative Committee Report, Defs.' Ex. 8, ECF No. 288-9 at A-10 (reflecting that Mr. Hutchins provided receipts for approximately $12,700 of the $18,000 he received between 1988 and 1990, and for nearly all of the $16,000 he received between 1991 and July 1993); Hutchins Receipts, ECF Nos. 296-7, 296-8, 296-9. Mr. Hutchins's receipts largely reflect expenditures at restaurants, as well as taxi and parking receipts. *See* Hutchins Receipts, ECF Nos. 296-7, 296-8, 296-9. Defendant Michael O'Connor appears only to have received an in-town allowance during 1994, but the record contains receipts for over $400 of the $500 he received each month. *See* O'Connor Receipts, Pl.'s Ex. 6, ECF No. 296-5. Mr. O'Connor's receipts included charges for restaurants, taxis, and parking. *See id.*

Accordingly, all three individual defendants provided receipts for a substantial portion of the in-town allowances they

received, and President Young's testimony explains why they might not have provided every single receipt: Although an income-tax benefit could be realized by providing receipts for everything, even an officer who kept receipts for essentially all of his expenses for years might decide that continuing to do so was not worth the administrative burden. In light of this record, the Court finds that direct evidence of how the remaining individual defendants actually used the in-town allowances demonstrates that these three individual defendants largely accounted for their expenses. To the extent they did not account for them, the record reflects that the financial incentive for submitting receipts that the Resolution required be kept for a "reasonable period" of time was outweighed by the administrative burden experienced by those, like President Young, who once sought to submit receipts for every expense. Finally, the existence of a significant record of receipts describing the types of union-related expenses contemplated by the Resolution supports testimony that $500 per month was a reasonable amount that a resident officer could expect to have to spend in order to perform the job. *See supra* at 9. This bolsters the conclusion that any unreceipted portion of these defendants' allowances was not used for personal gain.

Mr. Noble challenges the receipts themselves, calling them "worthless as evidence." Pl.'s Objs. at 3-4. Although phrased as

an evidentiary objection, Mr. Noble does not appear to dispute
their admissibility. Instead, he appears to argue that the
receipts cannot form the requisite evidence "of how the union's
money was actually used," *Noble III*, 525 F.3d at 1237, because
they do not contain a written notation of the purpose for which
the expense was incurred. This argument relies on an alleged
requirement that receipts contain such a notation. *See* Pl.'s
Objs. at 3-4.

Even if Mr. Noble were correct about the existence of an
independent requirement that receipts contain such a notation,
that does not render the receipts useless for the narrow purpose
to which the Circuit has directed this Court's focus: Weighing
against Mr. Noble's circumstantial evidence of misuse any
evidence put forth by the defendants of how they actually used
the in-town allowances. The defendants claim to have used the
allowances for union-related expenses at restaurants and for
transportation expenses. The receipts support this claim by
reflecting the contemporaneous submission by the individual
defendants of receipts for such expenses in connection with
applications for the monthly in-town allowance. Thus, even if
the failure to provide a written notation violated some other

legal requirement, not before the Court, the receipts would

still bear on the narrow question that is before the Court.[11]

**B.   Mr. Noble's Section 201 Claim**

In addition to his breach-of-fiduciary-duty claims under

Section 501, Mr. Noble brought a claim pursuant to Section 201

of the LMRDA. That provision requires labor unions to "file

annually with the Secretary [of Labor] a financial report,"

known as an LM-2 Report. 29 U.S.C. § 431(b). "The primary

purpose of § 201 is to make full information related to the

financial affairs of unions available to union members to

---

[11] Indeed, Mr. Noble's various citations do not bear on whether
the receipts are useful evidence regarding the Section 501 claim
that is before this Court. Mr. Noble's argument that NALC policy
or the NALC Constitution requires such notations is belied by
this Court's finding that the individual defendants had arguable
authority for accepting the in-town allowances without
accounting for them, pursuant to a distinct section of the NALC
Constitution that did not require itemized receipts. *See supra*
at 33-34; *Noble III*, 525 F.3d at 1235-36. Mr. Noble's reliance
on a December 9, 2004 letter from the Department of Labor is
unhelpful because that letter is not part of the record of this
case—it was created after discovery closed and the trial had
been held. *See* Pl.'s Objs. at 4. Moreover, the letter, which was
attached to a status report Mr. Noble filed in 2009, addressed
the Department of Labor's findings with respect to an entirely
distinct section of the LMRDA. *See* December 9, 2004 Letter, ECF
No. 257-2. Finally, Mr. Noble's assertion that IRS Regulations
require such notations is based solely on a 1985 letter from
Richard O'Connell to NALC officers, which directs officers to
supply certain information "which is required by I.R.S.
regulation when entertaining," including the purpose for the
expense. February 27, 1985 Letter, Pl.'s Ex. 76, ECF No. 296-15.
Even assuming the truth of this assertion, that does not make
the receipts irrelevant to the Court's assessment of Mr. Noble's
Section 501 claim.

strengthen their efforts to rid their unions of unworthy or corrupt officers." *McGinnis v. Local Union No. 710, Int'l B'hood of Teamsters*, 664 F. Supp. 1212, 1213 (N.D. Ill. 1987). The report must include specified information related to the union's finances, including assets, receipts, salaries, and similar matters. *See* 29 U.S.C. § 431(b). Section 201(c) creates a right of action for union members who (1) made a request to inspect documents "to verify" an LM-2 Report, (2) that was supported by "just cause," and (3) was denied by the union. *See* 29 U.S.C. § 431(c).

"The burden of proof in demonstrating just cause is on the union member, and he may not inquire into union records out of idle curiosity." *Mallick v. Int'l B'hood of Elec. Workers*, 749 F.2d 771, 784 (D.C. Cir. 1984) (citations omitted). The demonstration of just cause, moreover, is keyed to the particular information on an LM-2 report that the union member seeks to verify. *See Krokosky v. United Staff Union*, 291 F. Supp. 2d 835, 843 (W.D. Wisc. 2003) ("The statute's structure indicates that just cause ought to relate to the LM-2."). "Establishing 'just cause' requires the union member to state what he wishes to verify in the LM Reports and how the particular records he is requesting are expected to assist him in doing so." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 285 (5th Cir. 1993).

The precise scope of Mr. Noble's Section 201 claim has remained vague throughout this case. What is clear is that Mr. Noble sent the NALC three letters in 1993 that contained requests for the inspection of documents. *See supra* Part I.E. His August 16 and September 14 letters included requests for inspection of a variety of documents related both to his internal charges regarding payments to members of the Executive Committee, as well as other issues. *See supra* at 19-21. The NALC appeared to grant the August 16 request, did not respond to the September 14 request, and permitted Mr. Noble to inspect an unspecified set of records on October 7, 1993. *See id.* It is not clear whether that inspection granted access to everything Mr. Noble had requested.

Mr. Noble's third request was rejected by the NALC. His November 7, 1993 letter sought "a videotape and a copy of the transcript of the October 13th Special Meeting of the Convention," as well as "copies of payroll registers for several officers for the years 1988 through 1993." November 7, 1993 Letter from David Noble to Vincent Sombrotto, Ex. V. to NALC's Mot. for Summ. J., ECF No. 126. President Sombrotto rejected the requests in full on November 30, 1993. *See* November 30, 1993

Letter from Vincent Sombrotto to David Noble, Ex. W to NALC's Mot. for Summ. J., ECF No. 126.[12]

In his post-trial proposed findings of fact regarding the Section 201 claim, Mr. Noble recited the chronology of this correspondence, but did not explain which, if any of the requests made in his August 16 and September 14 letters had been refused. *See* Pl.'s Post-Trial Proposed Findings, ECF No. 241-3 ¶¶ 77-81. Rather, Mr. Noble made the general and conclusory statement that "[w]hile plaintiff has been furnished with some financial information while conducting discovery in the instant case, and a smaller amount after filing the charges, the material he has been permitted to review has been insufficient for him to verify even one of the NALC's annual LM-2 reports," *id.* ¶ 83, which was itself a verbatim quotation from Mr. Noble's pre-trial affidavit. *See* April 2, 2004 Noble Decl., ECF No. 215 ¶ 57.

This Court previously found that during the course of proceedings in this case—and in the lead up to the filing of this case—Mr. Noble had been given "access to all of the pertinent NALC records," rendering his Section 201 claim moot.

---

[12] Although it is clear from the record that Mr. Noble received in discovery copies of the videotape and transcript of the October 1993 Special Meeting, rendering that portion of the request moot, April 2, 2004 Noble Decl., ECF No. 215 ¶¶ 82, 84, it is not clear whether the other request has been satisfied.

*Noble II*, 2006 WL 2708796, at *11. The D.C. Circuit disagreed that a factual record existed to find that Mr. Noble had been permitted to inspect all documents he had requested to view, and therefore vacated this finding. *See Noble III*, 525 F.3d at 1241. It left for this Court to address the merits of the claim, "as well as the factual determination of what (if any) records Noble has requested but not yet received." *Id.* at 1242.

The existing record and the parties' post-remand pleadings do not permit the Court to make this determination. Mr. Noble's post-remand proposed findings made only a conclusory assertion that he has not been provided sufficient documents. *See* Pl.'s Proposals at 2, 4. The defendants' proposals reiterated that Mr. Noble has been provided access to a significant amount of documents, and noted that the limited set of discovery disputes he raised in 2002 had been fully complied with, but did not explain precisely what he has been given access to. *See* Defs.' Proposals at 8-9.

Nor can the Court rule in favor of either party's legal argument without a clearer explanation of which requests are at issue. The defendants' argument that Mr. Noble has not demonstrated just cause to inspect "any financial records other than those to which NALC has already given him access," Defs.' Proposals at 16, neither explains what Mr. Noble *has* been given access to, nor establishes why every single request Mr. Noble

made was entirely unsupported by just cause. At the same time, Mr. Noble's argument that his discovery of the challenged payments entitles him to a "broad review" of the NALC's finances cannot be evaluated without explanation of how that discovery provides just cause for specific requests that were rejected by the NALC.[13] Accordingly, the Court will direct the filing of supplemental briefs, which shall include citation to the trial record and any additional evidence the parties feel is necessary to resolve the Section 201 claim.

The Court notes that the burden is on Mr. Noble to explain to the Court why he is entitled to relief on his Section 201 claim. He must explain which inspection requests the NALC rejected, how the requests relate to the verification of the union's LM-2 Report, and the basis for a finding that the requests were supported by just cause. Mr. Noble's past unsupported and conclusory statements were insufficient and the Court may treat another failure by Mr. Noble to explain or provide evidentiary support for his claim as a forfeiture of the claim. *Cf. Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145,

---

[13] Mr. Noble's other argument, that the defendants waived their ability to contest his Section 201 claim because they raised no defense to it other than mootness, Pl.'s Proposals at 4, is incorrect: The D.C. Circuit referred to the defendants' arguments regarding the merits of the Section 201 claim, and suggested that this Court reach those arguments on remand. *Noble III*, 525 F.3d at 1242.

153 (D.C. Cir. 1996) (refusing, in connection with summary-judgment rule requiring clear and concise statements of material facts, to "plac[e] the burden on the court, rather than on the opposing party or his counsel, 'to winnow the wheat from the chaff'").

\*   \*   \*

Mr. Noble shall therefore file a pleading setting forth in precise detail, with corresponding evidentiary citations, which requests for the inspection of documents he claims were refused by the NALC, and why his Section 201 claim should succeed as to each individual request.

The defendants shall file a response to these arguments, which shall include, among whatever other arguments the defendants deem appropriate, an explanation, with corresponding evidentiary citations, whether any requests still pursued by Mr. Noble have been *fully* complied with.

Mr. Noble may file a reply brief, which shall respond to the defendants' arguments but may not raise new arguments. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992) (noting the general rule that courts "refuse[] to entertain arguments raised for the first time in an appellant's reply brief").

## III. Conclusion

For the foregoing reasons, the Court enters judgment in favor of the defendants on Mr. Noble's Section 501 claims and requests supplemental briefing regarding Mr. Noble's Section 201 claim. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
**United States District Judge**
**March 27, 2015**