**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
DAVID W. NOBLE, JR.,            )
                                )
            Plaintiff,          )
                                )
        v.                      ) Civil Action No. 94-302 (EGS)
                                )
VINCENT R. SOMBROTTO, et al.,   )
                                )
            Defendants.         )
_____)

**SUPPLEMENTAL FINDINGS AND CONCLUSIONS**

The history of this lawsuit is set out comprehensively in
this Court's post-remand Supplemental Findings and Conclusions
of March 27, 2015 and, accordingly, will not be rehashed again
here. *See Noble v. Sombrotto* ("*Noble IV*"), 84 F. Supp. 3d 11
(D.D.C. 2015). Pursuant to those Supplemental Findings and
Conclusions, the Court issued an Order entering judgment in
favor of the defendants⸺the National Association of Letter
Carriers ("NALC"), various individual NALC officers, an officer
of the union's Mutual Benefit Association, and an officer of the
union's Health Benefit Plan⸺on David Noble's claims under
Section 501 of the Labor-Management Reporting and Disclosure Act
("LMRDA"), 29 U.S.C. § 401, *et seq.*, regarding the payment of
in-town allowances. Order, ECF No. 305. The Court, however, was
unable to resolve Mr. Noble's other surviving claim that "the
defendants violated their obligations under Section 201 of the

1

LMRDA by refusing his requests to inspect certain documents in order to verify the contents of financial reports that the NALC filed with the Department of Labor." *Noble IV*, 84 F. Supp. 3d at 13.

The D.C. Circuit had vacated the Court's earlier finding that Mr. Noble's Section 201 claim was moot and had directed the Court to address the merits of that claim, "'as well as the factual determination of what (if any) records Noble has requested but not yet received.'" *Id.* at 32 (quoting *Noble v. Sombrotto* ("*Noble III*"), 525 F.3d 1230, 1242 (D.C. Cir. 2008)). But, on remand, the Court concluded that the existing record and the parties' post-remand pleadings did not permit the Court to make the requisite factual determination. *Id.* Mr. Noble's post-remand proposed findings made "a conclusory assertion that he has not been provided sufficient documents," *id.* (citing Pl.'s Suppl. Proposals ("Pl.'s Proposals"), ECF No. 270 at 2, 4), and the defendants' post-remand proposals "did not explain precisely what he has been given access to." *Id.* (citing Defs.' Suppl. Proposals ("Defs.' Proposals"), ECF No. 272 at 8-9). Without a clearer explanation of which requests are at issue, the Court found that it was unable to rule in favor of either party's Section 201 legal argument. *Id.*

Accordingly, the Court directed the parties to file supplemental briefs. *Id.* at 32-33. Specifically, Mr. Noble was

directed to "file a pleading setting forth in precise detail, with corresponding evidentiary citations, which requests for the inspection of documents he claims were refused by the NALC, and why his Section 201 claim should succeed as to each individual request," *id.* at 33; the defendants were directed to "file a response to these arguments, which shall include, among whatever other arguments the defendants deem appropriate, an explanation, with corresponding evidentiary citations, whether any requests still pursued by Mr. Noble have been *fully* complied with," *id.;* and Mr. Noble was permitted a reply brief. *Id.*

Upon consideration of those supplemental filings, the existing record, and the applicable law, the Court concludes that Mr. Noble is not entitled to examine any NALC documents and records. Accordingly, the Court enters judgment in favor of the defendants on Mr. Noble's Section 201 claim.

## I.   Findings of Fact

On August 16, 1993, Mr. Noble sent a letter to then-President of the NALC Vincent Sombrotto informing President Sombrotto that he had filed charges with the NALC Executive Council. August 16, 1993 Letter from David Noble to Vincent Sombrotto, Pl.'s Ex. 31, ECF No. 296-12 at 1. Mr. Noble asserted that his charges were based on "significant and substantial discrepancies between the constitutionally authorized amounts of compensation and expenses payable to [President Sombrotto] and

3

the members of the NALC Executive Council and the amounts disclosed under oath to the Department of Labor on the NALC's LM-2 Reports for the years 1984 through the present." *Id.* Mr. Noble further demanded "the right to inspect, review and verify any and all documents, receipts, records, bills, checks, ledgers, account books, petty cash receipts, charge slips, minutes, and resolutions" that related to his charges. *Id.* at 3.

President Sombrotto responded in a letter dated August 31, 1993. *See* August 31, 1993 Letter from Vincent Sombrotto to David Noble, Ex. Q to NALC's Mot. for Summ. J., ECF No. 126. Although President Sombrotto asserted that Mr. Noble had not established the "just cause" required for review of the NALC's records under the applicable federal statute, *id.* at 1 (citing 29 U.S.C. § 431(c)), he informed Mr. Noble that the NALC records relevant to his charges and "necessary to verify the NALC's LM-2 reports for 1988-1993" would be made available to him for his examination at the NALC's headquarters on September 13, 1993 or a date thereafter, and he directed Mr. Noble to contact Jerry Gutshall to make an appointment for the requested document and record examination. *Id.* at 1-2.

Prior to undertaking any examination of records at the NALC's headquarters, Mr. Noble wrote to Jerry Gutshall on September 14, 1993. *Noble IV*, 84 F. Supp. 3d at 21 (citing September 14, 1993 Letter from David Noble to Jerry Gutshall,

Pl.'s Ex. 38, ECF No. 296-13 at 1). In that September 14, 1993

letter, Mr. Noble indicated that he wanted to review documents

and records that fell into the following eighteen categories:

> 1.  The payroll records of President Sombrotto
>     and Secretary-Treasurer Richard P. O'Connell
>     from 1980 to the present date.
>
> 2.  All payroll records of the NALC Trustees from
>     1980 to the present.
>
> 3.  In order to understand the assets reported in
>     NALC's LM-2 reports, all records and
>     documents relating to the bank account at the
>     Minneapolis, Minnesota bank account at the
>     Union Bank & Trust Company, account number
>     110390400, from 1989 to the present.
>
> 4.  All receipts and other records and documents
>     referred to in Item "3" of the NALC Executive
>     Council's December 8, 1980 resolution
>     concerning the payment of "in-town"
>     entertainment expenses.
>
> 5.  Expense vouchers for all NALC Executive
>     Council members for August and September,
>     1988, 1990, and 1992. . . .
>
> 6.  All NALC financial ledgers and accompanying
>     notes, memoranda and reports prepared by the
>     NALC, its employees, agents and service
>     providers from 1981 to the present.
>
> 7.  All receipts, bills, checks, check stubs, and
>     charge card slips relating to expenditures
>     made by all current and former NALC Executive
>     Council members from 1981 to the present;
>
> 8.  All bank records and documents pertaining the
>     [sic] each and every account maintained by
>     the NALC;
>
> 9.  All receipts, bills, checks, check stubs,
>     charge card receipts, and any other document
>     in the actual or constructive possession of

the current NALC Executive Council members substantiating their receipt from the NALC of per diem expenses, "in-town expenses," housing expenses, and all other reimbursements since their election to national office;

10. All minutes, Executive Council resolutions and presidential rulings, of the NALC's Executive Council since January 1, 1980, in particular, all such documents that allegedly authorize the payment of per diem expenses, "in-town" expenses, FICA, medicare [sic], and "lost-time" and all other payments made to NALC Executive Council members during conventions;

11. All records and documents that have been filed with all and any agencies of the United States Government, including all LM Reports and accompanying correspondence by the NALC, its agents, and service providers;

12. All drafts of reports, records, and documents pertaining to the records and documents identified in paragraph # 5, above;

13. All correspondence received by the NALC, its agents and its service providers from any and all agencies of the United States Government concerning the information identified in the records and documents filed with all and any agencies of the United States Government;

14. All records, reports, notes, minutes, and other documents relating to audits and any investigation of alleged or suspected financial improprieties by any current or former NALC Executive Council member since January 1, 1980.

15. All records and documents relating to the financial and accounting standards utilized by the NALC, including accounting manuals and instructions;

16.   All records and documents relating to all and
      any payments made to any person, company,
      association, or partnership concerning the
      [sic] for housing expenses incurred by all
      and any members of the NALC Executive Council
      since January 1, 1980;

17.   All records and documents relating to all and
      any payments and/or reimbursements made to
      all and any members of the NALC Executive
      Council since 1980. [sic]; and

18.   All records and documents prepared by the
      NALC's legal staff, counsel, accounting staff
      and/or auditors discussing the propriety of
      NALC's payment and/or reimbursement of per
      diem    expenses,    "in-town"    expenses,
      "convention expenses" (including "lost-time
      expenses"),   housing   expenses,   FICA,   and
      medicare [sic] for NALC Executive Council
      members since January 1, 1980.

September 14, 1993 Letter from David Noble to Jerry Gutshall,

Pl.'s Ex. 38, ECF No. 296-13 at 1-3.

On October 7, 1993, Mr. Noble reviewed NALC records in

person at NALC headquarters. *Noble IV*, 84 F. Supp. 3d at 21

(citing April 2, 2004 Noble Decl., ECF No. 215 ¶ 58). Although

it is not clear what documents and records Mr. Noble examined

that day aside from "some payroll records" and certain

"applications for in-town expenses," April 2, 2004 Noble Decl.,

ECF No. 215 ¶ 58, Mr. Noble eventually received at least some

documents and records pertaining to categories 1, 2, 4, 6, 9,

10, 11, 16, and 17 as identified in his September 14, 1993

letter to Mr. Gutshall, but did not receive documents and

records pertaining to categories 3, 5, 7, 8, 12, 13, 14, 15, and

18. *See* Appellant's Suppl. Filing as Allowed by the Panel at Oral Arg., ECF No. 307-2 at 2; *see also* June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 31. The defendants do no argue that they provided Mr. Noble with access to the documents and records that pertain to categories 3, 5, 7, 8, 12, 13, 14, 15, and 18, although they emphasize that during discovery in this case they objected to Mr. Noble's request for the documents pertaining to category 3 concerning records related to a purported NALC bank account in Minneapolis, Minnesota. Resp. of Defs.' to Pl.'s Submission on Section 201(c) Issue ("Defs.' Resp."), ECF No. 314 at 3 (citing Resp. of Def. NALC to Pl.'s Interrogs. and First Req. for Produc. of Docs., Ex. to NALC's Mot. for Summ. J., ECF No. 126). Mr. Noble had "'attempted to use discovery to develop information about the Minneapolis regional office's unauthorized bank account,'" *Noble IV*, 84 F. Supp. 3d at 21 (quoting February 26, 2002 Noble Decl., ECF No. 139 ¶ 52), because in 1993 Mr. Jim Draper, who worked with Mr. Noble in the NALC's Minneapolis regional office in 1979 and 1980, told Mr. Noble "that he was concerned about what money was being deposited in the account and what was being done with money that was withdrawn from the account." June 15, 2015 Noble Decl., ECF No. 313-1 ¶¶ 15, 17. Mr. Draper later told Mr. Noble that in 1986 the Minneapolis office "made photocopies of union materials at the national union's expense, sold them to branches within the region, and

deposited the money in the Minneapolis bank account" and told Mr. Noble that funds from that account "had been used to pay at least some of the re-election costs of the Sombrotto slate." *Id.* ¶ 18. Mr. Noble maintains that the defendants have refused to let him review any records related to the purported Minneapolis bank account, *id.* ¶ 20, and that he wants to inspect those records "to determine whether union funds were used for the non-union purpose of electing candidates for union office" and "to determine whether the funds the bank account contained were reported in the union's LM-2 reports." *Id.* ¶ 19. But he is of the view that he will be unable to determine "whether the assets of the Minneapolis bank account were reported on the LM-2 reports" unless he can examine "the entirety of NALC's records." *Id.* ¶ 30. The defendants indicate that "NALC has never represented that it maintains a bank account in Minneapolis or that it has records of any such account." Defs.' Resp., ECF No. 314 at 2 n.1.

Additionally, in his September 14, 1993 letter to Mr. Gutshall, Mr. Noble stated a request to review all NALC documents and records related to "payments made . . . for housing expenses incurred by all and any members of the NALC Executive Council since January 1, 1980." September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 2. Mr. Noble seeks these documents and records to try

to substantiate a finding of the Investigating Committee that
reported to the October 13, 1993 Special Meeting of the NALC
Convention that was called to resolve Mr. Noble's internal union
charges. *See* June 15, 2015 Noble Decl., ECF No. 313-1 ¶¶ 27-28.
That finding was that NALC rent payments made for President
Sombrotto's and Secretary-Treasurer O'Connell's apartments were
deducted from President Sombrotto's and Secretary-Treasurer
O'Connell's paychecks. *Id.* Mr. Noble finds it suspicious that
the Investigating Committee never produced "copies of [President
Sombrotto's and Secretary-Treasurer O'Connell's] checks showing
the supposed deductions" for housing expenses paid by NALC on
their behalf. *See id.* ¶ 27. At least some documents and records
responsive to this request have been provided to Mr. Noble, *see*
Appellant's Suppl. Filing as Allowed by the Panel at Oral Arg.,
ECF No. 307-2 at 2, and Mr. Noble is of the view that only
review of "the entirety of NALC's records" will permit him to
determine whether the NALC payments covering President
Sombrotto's and Secretary-Treasurer O'Connell's housing expenses
were deducted from their paychecks. June 15, 2015 Noble Decl.,
ECF No. 313-1 ¶ 30.

By letter dated November 7, 1993, Mr. Noble additionally
requested from President Sombrotto a copy of a videotape and a
transcript of the October 13, 1993 Special Meeting of the NALC
Convention, and he requested payroll registers for NALC officers

for the years 1988 through 1993. *Noble IV*, 84 F. Supp. 3d at 21 (citing November 7, 1993 Letter from David Noble to Vincent Sombrotto, Ex. V to NALC's Mot. for Summ. J., ECF No. 126). Although President Sombrotto rejected those requests via letter dated November 30, 1993, *id.* (citing November 30, 1993 Letter from Vincent Sombrotto to David Noble, Ex. W to NALC's Mot. for Summ. J., ECF No. 126), Mr. Noble later received the requested videotape and transcript of the Special Meeting during discovery in this case. *Id.* at 32 n.12 (citing April 2, 2004 Noble Decl., ECF No. 215 ¶¶ 82, 84).

On September 30, 2002, this Court denied the parties' cross-motions for summary judgment and directed the parties "'to file a single, concise, specific, and final statement of each party's outstanding requests for documents or other tangible evidence, as well as efforts made to date to obtain them, by no later than October 31, 2002.'" *Id.* at 21-22 (quoting Order, ECF No. 151). In his statement filed in response to that Order, Mr. Noble identified four remaining discovery requests: "(1) 'transcripts and audio tapes of witnesses who testified before an internal NALC committee'; (2) 'video tapes of the October 1993 special convention'; (3) 'video tapes of the third session of the 1986 convention'; and (4) 'in-town expense applications for the individually named defendants.'" *Id.* at 22 (quoting Pl.'s Discovery Statement, ECF No. 152 at 2). The Court

11

subsequently ordered the defendants to make the requested materials available to Mr. Noble for a period of five days; directed Mr. Noble to "'provide defendants with a specific list of documents, tapes and videotapes he wishes to obtain copies of . . . , along with reasonable payment as agreed to by the parties for those copies'"; and directed the defendants to "'provide plaintiff with all copies of documents, tapes and videotapes requested and paid for by plaintiff.'" *Id.* (citing Order, ECF No. 155). The NALC has asserted that it has fully complied with this Order, *id.* (citing Defs.' Proposals, ECF No. 272 at 9), and Mr. Noble has never contested that assertion. *Id.* (citing Pl.'s Objs. to Defs.' Suppl. Proposals ("Pl.'s Objs."), ECF No. 284); *see also* Defs.' Resp., ECF No. 314 at 12.

Although Mr. Noble asserts that only "two LMRDA § 201(c) requests remain"——"[1] [his] request to review the records of the Minneapolis bank account, and [2] [his] request to verify NALC's LM-2s in their entirety," Pl.'s Reply to Resp. of Defs.' to Pl.'s Submission on Section 201(c) Issue ("Pl.'s Reply"), ECF No. 315 at 3; *see also* Pl.'s Suppl. Mem. Concerning the Issue of Verification of NALC's Forms LM-2 ("Pl.'s Suppl. Mem."), ECF No. 313 at 2——he also indicates that he still seeks to examine "NALC financial records to try to determine whether the payments made for Sombrotto's and O'Connell's apartments were truly paid for by deductions from their checks." *See* June 15, 2015 Noble Decl.,

ECF No. 313-1 ¶ 28. Thus Mr. Noble articulates three requests to review documents and records that the NALC has refused: (1) a request to review documents and records from January 1, 1989 through September 14, 1993 pertaining to a NALC bank account numbered 110390400 and located in Minneapolis, Minnesota, *see* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 1; (2) a request to review documents and records from January 1, 1980 through September 14, 1993 pertaining to NALC payments for housing expenses for President Sombrotto and Secretary-Treasurer O'Connell, *see id.* at 2; and (3) a request to review all documents and records responsive to the requests in categories 5, 7, 8, 12, 13, 14, 15, and 18 of his September 14, 1993 letter to Mr. Gutshall. *See* June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 31.

## II.  Conclusions of Law

Section 201 of the LMRDA "requires labor unions to 'file annually with the Secretary [of Labor] a financial report,' known as an LM-2 Report." *Noble IV*, 84 F. Supp. 3d at 31 (citing 29 U.S.C. § 431(b)). The LM-2 Report "must include specified information related to the union's finances, including assets, receipts, salaries, and similar matters." *Id.* (citing 29 U.S.C. § 431(b)). Section 201(c) imposes a judicially enforceable duty on unions and their officers to permit union members "for just cause to examine any books, records, and accounts necessary to

verify [an LM-2 report]." 29 U.S.C. § 431(c). Thus, "Section 201(c) creates a right of action for union members who (1) made a request to inspect documents 'to verify' an LM-2 Report, (2) that was supported by 'just cause,' and (3) was denied by the union." *Noble IV*, 84 F. Supp. 3d at 31 (citing *id.*).

Although the required just cause showing is minimal—"it is enough if a reasonable union member would be put to further inquiry," *Fruit and Vegetable Packers and Warehousemen Local 760 v. Morley*, 378 F.2d 738, 744 (9th Cir. 1967)—a union member "bears the burden of showing just cause for examining records." *Brennan v. Int'l Bhd. of Teamsters*, No. 95-1375, 1997 WL 446259, at *2 (D.D.C. July 30, 1997) (citing *Mallick v. Int'l Bhd. of Elec. Workers*, 749 F.2d 771, 784 (D.C. Cir. 1984)). Just cause is shown in either of two ways: "(1) when 'the union member had some reasonable basis to question the accuracy of the LM-2 or the documents on which it was based,' or (2) when 'information in the LM-2 has inspired reasonable questions about the way union funds were handled.'" *Krokosky v. United Staff Union*, 291 F. Supp. 2d 835, 840 (W.D. Wis. 2003) (quoting *Kinslow v. Am. Postal Workers Union, Chicago Local*, 222 F.3d 269, 274 (7th Cir. 2000)). As to the verification requirement—which courts often treat as part of the just cause requirement, *see Mallick*, 749 F.2d at 784 & n.30—the union member also bears the burden of establishing "a direct connection between records sought to be

14

accessed and the union's federal filings," such that a union member must "state what he wishes to verify in the LM Reports and how the particular union records he is requesting are expected to assist him in doing so." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 285-86 (5th Cir. 1993).

After directing the parties to submit supplemental filings with the Court in order to clarify "which requests are at issue" pursuant to the Section 201(c) claim, *see Noble IV*, 84 F. Supp. 3d at 32, the Court has found that Mr. Noble articulates three requests to review documents and records that the NALC has refused: (1) a request to review documents and records from January 1, 1989 through September 14, 1993 pertaining to a NALC bank account numbered 110390400 and located in Minneapolis, Minnesota; (2) a request to review documents and records from January 1, 1980 through September 14, 1993 pertaining to NALC payments for housing expenses for President Sombrotto and Secretary-Treasurer O'Connell; and (3) a request to review all documents and records responsive to the requests in categories 5, 7, 8, 12, 13, 14, 15, and 18 of his September 14, 1993 letter to Mr. Gutshall. *See supra* Part I.

### A.   **Mr. Noble Has Not Waived His Section 201(c) Claim**

The defendants argue that Mr. Noble has "waived his requests for the information that he now claims to seek" because he did not include them in his list of outstanding discovery

requests that he filed with the Court in response to the Court's
September 30, 2002 Order that directed each party "to file a
single, concise, specific, and final statement of [its]
outstanding requests for documents or other tangible evidence."
Defs.' Resp., ECF No. 314 at 7-8 (citing Order, ECF No. 151).
This waiver argument is unavailing.

First, as the Circuit Court acknowledged, discovery in this
case—and, particularly, the parties' responses to the Court's
September 30, 2002 Order for a "single, concise, specific, and
final statement" of outstanding discovery requests—was
primarily focused on Mr. Noble's Section 501(a) claims, not his
Section 201(c) claim. *See Noble III*, 525 F.3d at 1241-42
(explaining that the defendants have argued "that Noble
forfeited his claim to any further documents by failing to
request them properly in the course of *discovery on his § 501(a)
claims*") (emphasis added). Because discovery was focused on
documents and records related to the Section 501(a) claims and
not the Section 201(c) claim, Mr. Noble cannot be said to have
waived his Section 201(c) requests by not doggedly pursuing in
discovery the documents and records that are the focus of those
requests.

To the extent that the defendants' waiver argument is that
Mr. Noble, at certain junctures during discovery in this case,
sought the same records and documents pursuant to his Section

501(a) claims that he seeks pursuant to his Section 201(c) claim and by abandoning those discovery requests in the context of the Section 501(a) claims he has waived his attempt to access the documents and records via his Section 201(c) claim, that argument also fails. The D.C. Circuit has not definitively decided how Section 501(a) and Section 201(c) interact when it comes to accessing union documents and records, and it certainly has not held that not pursuing documents and records under Section 501(a) forfeits an attempt to access those same documents and records under Section 201(c). *See Mallick*, 749 F.2d at 785-86 (narrowly holding that, under the facts of the case, Section 501(a) provides no greater right to documents and records than Section 201(c)). Another Circuit has held that a union's LM-2 Report-related records can only be accessed pursuant to Section 201(c), not pursuant to Section 501(a). *Gabauer v. Woodcock*, 594 F.2d 662, 668 (8th Cir. 1979) (en banc) ("We do not view s 501 as an independent discovery tool to investigate official use of union funds. Section 201 provides that tool."). Thus Mr. Noble cannot be said to have waived his attempt under Section 201(c) to examine certain of the NALC's LM-2 Report-related records by abandoning his attempt to access those records through discovery on his Section 501(a) claims.

Second, to the extent that the defendants' argument is that Mr. Noble failed to use discovery to access the documents and

records he seeks pursuant to his Section 201(c) claim and thereby waived his Section 201(c) claim, *see* Defs.' Resp., ECF No. 314 at 8, or that he did use discovery requests to try to access certain documents and records that were solely the subject of his Section 201(c) claim and then waived his Section 201(c) claim by eventually abandoning those discovery requests, *see id.* at 7, those arguments also fail. Using discovery to access the documents and records that are the subject of a Section 201(c) claim makes little sense because, like in the Freedom of Information Act context, in the Section 201(c) context a court should not grant discovery "that would be tantamount to granting the final relief sought." *See Tax Analysts v. IRS*, 410 F.3d 715, 722 (D.C. Cir. 2005) (internal quotation marks omitted). If discovery could be used to review the documents and records that are the subject of a Section 201(c) claim, such discovery would "turn [Section 201(c)] on its head, awarding [a plaintiff] in discovery the very remedy for which it seeks to prevail in the suit." *See id.* Accordingly, Mr. Noble's failure to use discovery to access the documents and records that are the subject of his Section 201(c) claim, *see* Defs.' Resp., ECF No. 314 at 8, or his abandonment of attempts to use discovery to access those documents and records, *see id.* at 7, does not amount to waiver of his Section 201(c) claim. Mr.

Noble cannot be said to have waived an opportunity that was never his for the taking.[1]

### B.   Mr. Noble is Not Entitled to Relief on the Merits of His Section 201(c) Claim

Mr. Noble fails to carry his burden of demonstrating to the Court that he is entitled to relief on the merits of his Section 201(c) claim. He comes closest to carrying that burden in the context of his most clearly articulated request to examine NALC documents and records: His request to examine all of the NALC's documents and records from January 1, 1989 through September 14, 1993 pertaining to a NALC bank account numbered 110390400 and located in Minneapolis, Minnesota. Mr. Noble requested access to these Minneapolis bank account documents and records in his September 14, 1993 letter to Mr. Gutshall. *See* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 1. The NALC never gave Mr. Noble access to these documents and records and, instead, has emphasized in its waiver argument that it objected to Mr. Noble's request for them

---

[1] In any event, even when a court does permit discovery in the context of a Section 201(c) claim, the scope of discovery is not understood to demarcate the scope of the documents and records ultimately subject to the reach of Section 201(c). *See Landry v. Sabine Indep. Seamen's Ass'n*, 623 F.2d 347, 349-50 (5th Cir. 1980) (holding that union members were entitled to union documents and records dating from 1970 even though their discovery request, consistent with the district court's pre-trial discovery order, only sought documents and records dating from January 1, 1975).

during discovery and that, thereafter, Mr. Noble did not seek them again during discovery. *See* Defs.' Resp., ECF No. 314 at 7. But, for the reasons stated above, Mr. Noble's abandonment of his attempt to obtain these documents and records through discovery did not amount to waiver of his claim to them under Section 201(c). *See supra* Part II.A.

Further, Mr. Noble satisfies Section 201(c)'s just cause requirement as it pertains to the Minneapolis bank account records request. Mr. Noble's just cause burden is minimal. He carries that burden if a reasonable union member in his position "'would be put to further inquiry.'" *Mallick*, 749 F.2d at 782 (quoting *Morley*, 378 F.2d at 744). A union member who has been told by someone who worked in the NALC's Minneapolis regional office that the NALC might have been concealing money in a bank account in Minneapolis, Minnesota, as Mr. Noble was, would be put to further inquiry regarding that bank account and whether its funds were properly reported in the union's federal financial filings. *See* June 15, 2015 Noble Decl., ECF No. 313-1 ¶¶ 15-20. Accordingly, Mr. Noble has carried his burden of demonstrating just cause to inspect the NALC's documents and records concerning the Minneapolis bank account.

But Mr. Noble fails to satisfy Section 201(c)'s verification requirement as it pertains to the Minneapolis bank account records request. To satisfy this requirement, Mr. Noble

must demonstrate a "direct connection between records sought to be accessed and the union's federal filings," *Fernandez-Montes*, 987 F.2d at 286, which requires him "[1] to state what he wishes to verify in the LM Reports and [2] how the particular union records he is requesting are expected to assist him in doing so." *Id.* at 285.

Mr. Noble satisfies the first of these two sub-requirements: that he must "state what he wishes to verify in the LM Reports." *Id.* One of Mr. Noble's stated motivations for examining the Minneapolis bank account documents and records—— "to determine whether union funds were used for the non-union purpose of electing candidates for union office," June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 19——is insufficient because a request for records grounded in political opposition to union officials that is not directly keyed to a specific concern with transactions summarized on an LM-2 Report does not involve verification of an LM-2 Report. *See Mallick*, 749 F.2d at 782-83 (citing *Flaherty v. Warehousemen, Garage and Serv. Station Emps.' Local Union No. 334*, 574 F.2d 484, 486 (9th Cir. 1978)). However, Mr. Noble separately articulates a motive "to inspect the records of the Minneapolis bank account . . . to determine whether the funds the bank account contained were reported in the union's LM-2 reports." June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 19. That intent to confirm whether certain bank funds

are reported in the NALC's LM-2 Reports has remained consistent throughout the life of this case, *see* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 1 (requesting documents and records relating to the Minneapolis bank account "to understand the assets reported in NALC's LM-2 reports"), and is a clear articulation of "what [Mr. Noble] wishes to verify in the LM Reports." *See Fernandez-Montes*, 987 F.2d at 285. The defendants' argument that Mr. Noble does not satisfy the sub-requirement of stating what he wishes to verify in the NALC's LM-2 Reports is unavailing. They argue that Mr. Noble has not identified "any particular entry on any of NALC's LM-2 reports" that he seeks to verify or that he believes to be "suspicious or questionable." Defs.' Resp., ECF No. 314 at 10. That line of argument fails because if it prevailed, "unions that wished to shield certain information from scrutiny would omit it from their LM-2 filings and would effectively preclude any subsequent § 201(c) actions demanding the information." *Bembry v. New York Metro Postal Union*, No. 08-2369, 2009 WL 690245, at *7 (S.D.N.Y. Mar. 12, 2009). Accordingly, Mr. Noble does not need to point "to particular lines on the LM-2" to sufficiently articulate what it is that he seeks to verify in the NALC's LM-2 Reports. *See id.* What he seeks to verify is whether the Minneapolis bank account funds were reported in the NALC's LM-2 Reports.

But Mr. Noble fails to satisfy the second of the verification sub-requirements: that he must "state . . . how the particular union records he is requesting are expected to assist him" in verifying the NALC's LM-2 Reports. *See Fernandez-Montes*, 987 F.2d at 285. While Mr. Noble articulates that he "would like to inspect the records of the Minneapolis bank account and NALC's LM-2s to determine whether the funds the bank account contained were reported in the union's LM-2 reports," June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 19, and thereby articulates *what* he seeks to verify in the NALC's LM-2 Reports, he does not articulate *how* the Minneapolis bank account records will help him achieve that verification. Instead, he asserts that it is "only by looking at the entirety of NALC's records" that he will be able to determine "whether the assets of the Minneapolis bank account were reported on the LM-2 reports." *Id.* ¶ 30. By conceding that *only* review of the entirety of the NALC's records will permit him to verify that the Minneapolis bank account funds were reported in the NALC's LM-2 Reports, Mr. Noble admits that he does not know and, consequently, is unable to explain how examination of the Minneapolis bank account records——separate and apart from the *entirety* of the NALC's records——will assist him in verifying that the bank account funds were reported in the NALC's LM-2 Reports. Without that explanation, the Court is unable to permit Mr. Noble to undertake an

examination of the NALC records pertaining to the Minneapolis bank account. Denying Mr. Noble that opportunity to examine records is consonant with the reason Section 201(c) demands that union members explain how the particular union records sought to be examined are expected to assist them in verifying LM-2 Reports: "[T]o guard against the 'wholesale random audits' of unions' financial records." *See Bembry*, 2009 WL 690245, at *7 (citing *Ellis v. Civil Serv. Emps. Ass'n, Inc.*, No. 95-105, 1995 WL 779266, at *4 (N.D.N.Y. Dec. 29, 1995)). Mr. Noble's inability to articulate how the bank records——separate and apart from the entirety of the NALC's records——could help him verify the NALC's LM-2 Reports reveals his crusade to undertake an impermissible "wholesale random audit" of the NALC's records.

Mr. Noble's two other record examination requests——a request to examine documents and records from January 1, 1980 through September 14, 1993 pertaining to NALC payments for housing expenses for President Sombrotto and Secretary-Treasurer O'Connell, and a request to examine all documents and records responsive to the requests in categories 5, 7, 8, 12, 13, 14, 15, and 18 of his September 14, 1993 letter to Mr. Gutshall—— miss the Section 201(c) mark by a wider margin. As concerns the request to examine records pertaining to payments for housing expenses, the failure of the Investigating Committee to produce "copies of [President Sombrotto's and Secretary-Treasurer

O'Connell's] checks showing the supposed deductions" for housing expenses paid by NALC on their behalf, *see* June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 27, satisfies the minimal just cause requirement, as a reasonable union member in Mr. Noble's position "would be put to further inquiry." *See Morley*, 378 F.2d at 744. But this request satisfies neither of the verification requirement's prongs. At no point——not in his September 14, 1993 letter to Mr. Gutshall, *see* September 14, 1993 Letter from David Noble to Jerry Gutshall, Pl.'s Ex. 38, ECF No. 296-13 at 3, nor in his supplemental memorandum in support of his Section 201(c) claim, *see generally* Pl.'s Suppl. Mem., ECF No. 313, nor anywhere else——does Mr. Noble explain "what he wishes to verify in the LM Reports" by examining records related to housing expense payments. *See Fernandez-Montes*, 987 F.2d at 285. He makes clear that he seeks to verify "whether the payments made for Sombrotto's and O'Connell's apartments were truly paid for by deductions from their checks," June 15, 2015 Noble Decl., ECF No. 313-1 ¶ 28, but he does not sufficiently articulate what it is that he seeks to verify in the NALC's LM-2 Reports. He does not simply state that he seeks to verify whether the housing payments were reported in the NALC's LM-2 Reports, and the Court will not fill in the blanks for him——the Section 201(c) burden is Mr. Noble's to carry, not the Court's. Furthermore, without articulating what it is that he seeks to verify in the LM-2

reports by examining these housing expense payment records, it is impossible for Mr. Noble to state "how the particular union records he is requesting are expected to assist him" in that verification of LM-2 Reports. *See Fernandez-Montes*, 987 F.2d at 285.

As concerns Mr. Noble's request to examine all of the documents and records responsive to the requests in categories 5, 7, 8, 12, 13, 14, 15, and 18 of his September 14, 1993 letter to Mr. Gutshall, Mr. Noble points to a laundry list of actions taken by NALC officers over the years that he asserts amount to just cause for his generalized "request to verify NALC LM-2s." *See* Pl.'s Suppl. Mem., ECF No. 313 at 2-3. Even assuming that some of these activities would put Mr. Noble "to further inquiry," *Morley*, 378 F.2d at 744, he again fails to articulate what it is exactly that he "he wishes to verify in the LM Reports" by means of this request to examine an enormous amount of the NALC's documents and records. *See Fernandez-Montes*, 987 F.2d at 285. Mr. Noble does not need to point "to particular lines on the LM-2" to sufficiently articulate what it is that he seeks to verify in the NALC's LM-2 Reports, *see Bembry*, 2009 WL 690245, at *7, but he needs to be more specific than just repeating that he seeks "to verify NALC LM-2s." *See* Pl.'s Suppl. Mem., ECF No. 313 at 2, 3; Pl.'s Reply, ECF No. 315 at 3, 4. And, again, without more specificity about what it is that he

seeks to verify in the NALC LM-2 Reports by means of this expansive request, it is impossible for Mr. Noble to state "how the particular union records he is requesting are expected to assist him" in that verification. *See Fernandez-Montes*, 987 F.2d at 285. At bottom, Mr. Noble's request to review all of the NALC documents and records responsive to the requests in categories 5, 7, 8, 12, 13, 14, 15, and 18 of his September 14, 1993 letter to Mr. Gutshall amounts to an attempt to undertake a "wholesale random audit" of the NALC's records that should not be permitted. *See Ellis*, 1995 WL 779266, at *4.[2]

## III. Conclusion

For the foregoing reasons, the Court enters judgment in favor of the defendants on Mr. Noble's Section 201 claim. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**January 17, 2017**

---

[2] Having concluded that Mr. Noble is not entitled to review any documents and records because he fails to satisfy Section 201(c)'s requirements as they apply to his three requests for document and record examination, the Court does not need to address the defendants' argument that Mr. Noble's Section 201(c) claim against the individual defendants fails because Mr. Noble has not established that the individual defendants, separate and apart from the NALC, have actual possession of the documents and records he seeks to inspect. *See* Defs.' Resp., ECF No. 314 at 11.